## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| DONALD BELL; KATRINA BELL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:05 CV 658-T |
| | ) | |
| TRAVELERS PROPERTY CASUALTY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## BRIEF IN SUPPORT OF STANDARD FIRE'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the defendant, The Standard Fire Insurance Company, incorrectly identified in the plaintiffs' complaint as Travelers Property Casualty Company (hereinafter referred to as "Standard Fire"),[1] and submits the following memorandum Brief in Support of its Motion for Summary Judgment. As this brief and the supporting Evidentiary Submission filed concurrently herewith will show, Standard Fire is entitled to final summary judgment based on the undisputed facts.

### INTRODUCTION

This case involves a claim for property damage under a homeowners' insurance policy issued by Standard Fire. The plaintiffs, Donald and Katrina Bell, reported damage to their property following storms associated with Hurricane Ivan. The plaintiffs' insurer, The Standard Fire Insurance Company, conducted a thorough investigation of the plaintiffs' claim. Several inspections

---

[1] The Standard Fire Insurance Company, which issued the policy in question, is a separate corporate entity and a direct wholly owned subsidiary of Travelers Group Holdings, Inc., which is a wholly-owned subsidiary of Travelers Property Casualty Corporation.

were conducted as part of this investigation. After the investigation was completed, David Gibbs, on behalf of Standard Fire, reviewed all the inspection reports and determined that only a portion of the damages claimed by the plaintiffs was covered under the policy. Standard Fire then issued payments totaling $37,318.13 to the plaintiffs for their covered losses.

Standard Fire never denied the plaintiffs' claim. Rather, it concluded, after its full and complete investigation, that although the plaintiffs suffered some storm-related damage, which is a covered loss under the policy, the majority of the damages they claimed were not storm related and, therefore, not covered under the policy. In investigating and paying the plaintiffs' claim, Standard fire neither breached any contract with the plaintiffs nor acted in bad faith. Accordingly, Standard Fire's motion for summary judgment is due to be granted, and the plaintiffs' claims are due to be dismissed with prejudice.

## STATEMENT OF UNDISPUTED FACTS

The plaintiffs, Donald and Katrina Bell, own a home located at 9030 County Road 59 in Pine Apple, Alabama. (See Standard Fire's Evidentiary Submission, Exhibit "A," Plaintiffs' Complaint at ¶ 5.) The home is a two-story house, approximately 150 years old, with much of the floors, walls, and ceilings consisting of original construction. (See Standard Fire's Evidentiary Submission, Exhibit "B," Report of Richard Steed of PCI, p.2) Standard Fire issued a homeowners' insurance policy to Donald and Katrina Bell, policy number 94622268  633  1, which provided potential coverage for the policy period June 26, 2004 to June 26, 2005. (See Standard Fire's Evidentiary Submission, Exhibit "C," Policy of Insurance issued by The Standard Fire Insurance Company.) The

policy identified the residence premises[2] insured under the policy as 9030 County Road 59, Pine Apple, Alabama, 36741. (See Exhibit "C" at Page 1 of 2.) The plaintiffs purchased the policy through their insurance agent, Insurance Counselors, Inc. (Exhibit "C" at Page 1 of 2.)

The plaintiffs claim that, on September 14, 2004, storms associated with Hurricane Ivan damaged their home and its contents. (See Standard Fire's Evidentiary Submission, Exhibit "A," Plaintiffs' Complaint at ¶ 6.) On September 15, 2004, Mr. Bell made a formal claim to Standard Fire for damages allegedly caused by Hurricane Ivan. (See Standard Fire's Evidentiary Submission, Exhibit "A," Plaintiffs' Timeline, and Exhibit "E" at Bates No. SF0048.) The plaintiffs' claim included damage to the home's roof, water damage to portions of the home's interior, damage to outside buildings from a fallen tree, and food spoilage. (See Standard Fire's Evidentiary Submission, Exhibit "E" at Bates No. SF 0036.) After the plaintiffs made their claim, Standard Fire specifically instructed the plaintiffs to take necessary steps to protect their property from further damage. (See Exhibit "D" at Page 1, and Exhibit "E" at Bates No. SF 0036.)

After receiving the plaintiffs' report of loss, Standard Fire conducted an investigation into the plaintiffs' claims by retaining an independent adjustor, a cost estimator, structural and civil engineers, and an electrician to examine the property and investigate the claim. (See Standard Fire's Evidentiary Submission, Exhibit "E" at Bates No.0050-53.) These inspections were conducted at various times, by people with different areas of expertise, as a result of the various categories of claims made by the plaintiffs. (See Standard Fire's Evidentiary Submission, Exhibit "E.")

---

[2]The policy defines "residence premises" as the one or two family dwelling, other structures, and grounds or that part of any other building where you reside and which is shown as the residence premises in the Declaration. (See Exhibit "D" at Page 2 of 21.)

After gathering information from the plaintiffs by telephone, Standard Fire initially retained the services of Insurance Claims Adjusters ("ICA"), an independent appraisal company, to conduct a preliminary inspection of the plaintiffs' home. (See Standard Fire's Evidentiary Submission, Exhibit "E" at Bates No. SF 0050.) Travis Cartwright of ICA conducted an initial inspection of the plaintiffs' home on October 2, 2004. (See Standard Fire's Evidentiary Submission, Exhibit "E" at Bates No. SF0048.) Prior to being able to complete his investigation and provide the results of this investigation to Standard Fire, Mr. Cartwright was involved in a tragic car accident and was seriously injured as a result. (See Standard Fire's Evidentiary Submission, Exhibit "E" at Bates Nos. SF 0048 and SF 0050.) Moreover, as a result of his injuries, Mr. Cartwright was in a coma and, therefore, unable to verbally provide the results of his inspection. (See Standard Fire's Evidentiary Submission, Exhibit "E" at Bates No. 0048.)

Due to the unfortunate and unforseen events surrounding Mr. Cartwright's inspection, Standard Fire asked a second adjuster from ICA, Ronnie Greenhouse, to conduct a second inspection of the plaintiffs' home. (Exhibit "E" at Bates No. 0050.) Mr. Greenhouse contacted the plaintiffs and scheduled an inspection for November 28, 2004. (See Exhibit "D" at Page 1.) As a result of his inspection on November 28, 2004, Mr. Greenhouse determined that an engineer was needed to inspect certain portions of the plaintiffs' home for possible structural damage. (See Exhibit "D"at Page 2.) The engineering firm of Cain & Associates was then retained to conduct an inspection of the home's foundation. (Exhibit "E" at Bates No. 0051.) This inspection was performed by William Bridges, a structural engineer, on December 8, 2004. (See Standard Fire's Evidentiary Submission, Exhibit "F.") A report of that inspection, provided on December 17, 2004, noted that the plaintiffs

4

had not made any temporary repairs or other actions to protect the home from further damage as of the date of this inspection. (See Standard Fire's Evidentiary Submission, Exhibit "F" at Page 14.)

Although the purpose of Mr. Bridges' inspection was to inspect the home's foundation to determine if any foundation movement had occurred during Hurricane Ivan, once Mr. Bridges arrived at the plaintiffs' home, Mr. Bell proceeded to point out damage to the interior and exterior of the home, which he claimed was storm related. (See Standard Fire's Evidentiary Submission, Exhibit "F" and Exhibit "E" at Bates No. SF 0044.) Mr. Bridges noted in his report some damage to the home's roof; however, he was only able to conduct a visual inspection of the roof from the ground and did not inspect the attic space during his December 8, 2004 visit. (See Standard Fire's Evidentiary Submission, Exhibit "E" at Bates No. SF 0044 and Exhibit "F.") Mr. Bridges' report contains numerous photographs that reference damage to the interior of the plaintiffs' home but, unless specifically noted, Mr. Bridges make no conclusions as to the cause of this damage. (Exhibit "F.")

Upon receipt of the preliminary reports from ICA and Cain & Associates, Standard Fire determined that the claim needed to be assigned to a more senior claims handler, David Gibbs. (Exhibit "E" at Bates No. SF 0051.) After speaking with Mr. Greenhouse, Mr. Gibbs determined that additional investigation was needed. (Exhibit "E" at Bates No. SF 0043.) David Gibbs also contacted Hal Cain with Cain & Associates to discuss the report received from his engineering firm (Exhibit "E" at Bates No. SF 0044.)

As a result of the information provided in these preliminary reports and in the conversations with Mr. Greenhouse and Mr. Cain, David Gibbs determined that additional inspections of the subject property were required in order to complete a thorough investigation of the plaintiffs' claim

(Exhibit "E" and Bates Nos. 0043-44.)  David Gibbs thereafter set up a time to personally inspect the plaintiffs' home and made arrangements to attend a follow up inspection accompanied by an electrician, a cost estimator, and a civil engineer.  (Exhibit "E" at Bates No. SF 0047.)  These additional inspections were performed on January 19, 2005, and included that of Gulf States General Contractors.  (See Standard Fire's Evidentiary Submission, Exhibit "E" at Bates No. 0047.)

Project estimator Daniel Engel of Gulf States inspected the plaintiffs' home and several out buildings to ascertain the extent of any storm-related damage. (See Standard Fire's Evidentiary Submission, Exhibit "G.")  Mr. Engel made a preliminary visit to the plaintiffs' home on December 26, 2004, and returned to further inspect the property on January 19, 2005. (See Standard Fire's Evidentiary Submission, Exhibit "G.")  Following his inspection, Mr. Engel determined that the home had sustained some storm-related damage to portions of its roof, ceiling and walls. (See Standard Fire's Evidentiary Submission, Exhibit "G.")  He also noted damage to an arbor, chicken house and fence. (See Standard Fire's Evidentiary Submission, Exhibit "G.")  Mr. Engel provided a repair estimate of $2,915.59 for the home and a repair estimate of $4,492.54 for structures other than the home. (See Standard Fire's Evidentiary Submission, Exhibit "G.")

Mr. Richard Steed of Professional Inspection Consultants, Inc. also conducted an inspection of the home on January 19, 2005. After completing his inspection, Mr. Steed also determined that, as a result of storms associated with Hurricane Ivan, the plaintiffs' home sustained damage to certain portions of its roof, ceilings, and walls from water damage. (See Standard Fire's Evidentiary Submission, Exhibit "B.")  He also noted damage associated with the storm to out buildings, fences, and trees. (See Standard Fire's Evidentiary Submission, Exhibit "B.")  While Mr. Steed found that the house had sustained some damage as a result of Hurricane Ivan, Mr. Steed concluded that the

damage that the plaintiffs' home sustained as a result of Hurricane Ivan was not significant. (See Standard Fire's Evidentiary Submission, Exhibit "B.")  Although the plaintiffs claimed substantial damage to their home as a result of storm damage, Mr. Steed determined that the majority of this damage was not related to the storm.  (See Standard Fire's Evidentiary Submission, Exhibit "B.")

Danny Hamner of Prickett-Hamner Electric conducted an electrical inspection of the plaintiffs' home on January 19, 2005. (See Standard Fire's Evidentiary Submission, Exhibit "H.") After completing the inspection, Mr. Hamner concluded that, while the control voltage transformer for the pump to the well that serviced the plaintiffs' home was damaged from a possible power surge, there were no other electrical problems with the home's electrical system except for one GFI receptacle in an upstairs bathroom that was not working properly. (See Standard Fire's Evidentiary Submission, Exhibit "H.")  Following these inspections, and after reviewing the additional reports and repair estimates from Mr. Steed, Mr. Hamner, and Mr. Engel, David Gibbs, on behalf of Standard Fire, made payment to the plaintiffs for those damages that were covered damages under the policy. (See Standard Fire's Evidentiary Submission, Exhibit "E" at Bates No. SF 0047.)

Standard Fire did not deny the plaintiffs' claim.  (Exhibit "E" at Bates No.0047.)  Rather, Standard Fire paid the plaintiffs $6,908.13, the amount of the repair estimates for the storm-associated damage to the dwelling and other structures, less the plaintiffs' $500.00 deductible. (See Standard Fire's Evidentiary Submission, Exhibits "D" and "E.")  Standard Fire also paid the plaintiffs for additional covered damages, which included payments of $7,200.00 for expenses associated with renting substitute housing; $9,600.00 for move-out expenses; and $13,610.00 for loss of personal property. (See Standard Fire's Evidentiary Submission, Exhibit "D.")  In total, Standard Fire paid the plaintiffs $37,318.13 for their claim.

7

On June 24, 2005, the plaintiffs filed suit in the Circuit Court of Montgomery County, Alabama against Travelers Property Casualty Insurance Company, more correctly identified as The Standard Fire Insurance Company, alleging breach of contract, bad faith failure to pay policy benefits, and bad faith failure to investigate the plaintiffs' claim. (See Standard Fire's Evidentiary Submission, Exhibit "A.") On July 15, 2005, Standard Fire removed this case to the United States District Court for the Middle District of Alabama, Northern Division, where it is presently pending. (See Standard Fire's Evidentiary Submission, Exhibit "I.")

## ARGUMENT AND CITATION TO AUTHORITY

Standard Fire is entitled to final summary judgment in this action because the undisputed evidence demonstrates the absence of any genuine issue of material fact. Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## I.    BREACH OF CONTRACT

In Count One of their Complaint, the plaintiffs allege that Standard Fire breached the insurance contract by refusing to properly pay the benefits due under the Standard Fire policy. (Exhibit "A.") The plaintiffs carry the burden of proof on each element of the cause of action for breach of contract. "To establish a breach-of-contract claim, a plaintiff must show (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." Jones v. Alfa Mutual Ins. Co., 875 So. 2d 1189,

1195 (Ala. 2003); see also, State Farm Fire & Cas. Co. v. Slade, 747 So. 2d 293, 303 (Ala. 1999) (quoting Southern Medical Health Systems, Inc. v. Vaughn, 669 So. 2d 98, 99 (Ala. 1995)).[3]

Standard Fire does not dispute that the policy was in existence. However, Standard Fire does dispute that it was obligated to make any additional payments to the plaintiffs under the terms of the policy. Standard Fire is obligated to pay only those claims, or portion of claims, for which the policy provides coverage. Here, the undisputed evidence establishes that only a portion of the plaintiffs' claim (that portion paid by Standard Fire) falls within the coverage of this policy. Standard Fire was only required to pay those portions of the plaintiffs' claims specifically caused by the storm, which was the sole covered cause of loss. Standard Fire did so. Accordingly, as the undisputed evidence establishes, no genuine issue of material fact exists because Standard Fire paid all monies due to the plaintiffs under the Standard Fire policy.

The Standard Fire policy first sets forth those specific items of property for which coverage is available:

SECTION I - PROPERTY COVERAGES

COVERAGE A - DWELLING

We cover:

---

[3]Alabama follows the *lex loci contractus* doctrine. Thus, when interpreting contracts of insurance, Alabama courts apply the substantive law of the place where the last act necessary to entering into the contract occurred. See, e.g., Donegal Mut. Ins. Co. v. McConnell, 562 So. 2d 201, 203 (Ala. 1990) (holding that, under Alabama's choice of law rule, Pennsylvania law governs interpretation of an automobile insurance policy executed in Pennsylvania). Generally, the place of execution of an insurance policy is considered to be the place wehre the policy was delivered to the insured. The policy declaration page shows a Furman, Alabama address for Donald and Katrina Bell. Therefore, Alabama law governs the interpretation of the policy.

a.      the dwelling on the **residence premises** shown in the Declarations used principally as a private residence, including structures attached to the dwelling on the same or contiguous foundation; and

. . .

## COVERAGE B - OTHER STRUCTURES

We cover:

Other structures on the **residence premises**, separated from the dwelling by clear space. Structures with a separation from the dwelling and its foundation and linked by only a conduit, deck, fence, patio, utility line, walk, wall, or similar connector means that structure is an other structure. Other structures include but are not limited to:

a.      Barns;

b.      Exterior walls that do not support the roof of the dwelling;

c.      Fences;

d.      Garages that are detached from the dwelling;

e.      Gazebos;

f.      Sheds; or

g.      Swimming pools that are exterior to the walls supporting the roof of the dwelling.

. . .

## COVERAGE C - PERSONAL PROPERTY

We cover personal property owned or used by any **insured** while it is anywhere in the world.

(Exhibit "C" at Page 2 of 21.)

## COVERAGE D - LOSS OF USE

The limit of liability for Coverage D is the total for all the following coverages.

10

1.  **Additional Living Expense.** If a loss covered under this Section makes the **residence premises** uninhabitable, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living. PAYMENT SHALL BE FOR THE SHORTEST TIME REQUIRED TO REPAIR OR REPLACE THE PREMISES OR, IF YOU PERMANENTLY RELOCATED, THE SHORTEST TIME REQUIRED FOR YOUR HOUSEHOLD TO SETTLE ELSEWHERE. This period of time is not limited by expiration of this policy.

. . .

ADDITIONAL COVERAGES

1.  Debris Removal.

    We will pay the reasonable expense incurred by you in:

    a.  the removal of debris of Covered property PROVIDED COVERAGE IS AFFORDED FOR THE PERIL CAUSING THE LOSS; and

    b.  the removal of one or more trees fallen on the **residence premises** as a result of a peril insured against UNDER SECTION I - PERILS INSURED AGAINST, COVERAGE A - DWELLING AND COVERAGE B - OTHER STRUCTURES, but not more than $500 for any one occurrence regardless of the number of fallen trees.

    Debris removal expense is included in the limit of liability applying to the damaged property. When the amount payable for the actual damage to the property plus the expense for debris removal exceeds the limit of liability for the damaged property, an additional 5% of that limit of liability will be available to cover debris removal expense. However the availability of this additional amount does not change the $500 maximum payable for tree debris removal under subsection b above.

(Exhibit "C" at Page 4 of 21.)

The policy then specifically sets forth the "Perils Insured Against," which identifies the only perils for which the property previously described is insured:

SECTION I - PERILS INSURED AGAINST

COVERAGE A DWELLING AND - COVERAGE B OTHER STRUCTURES

11

We insure against risks of direct physical loss to property described
in **COVERAGE A** and **B, EXCEPT:**

A.    WE DO NOT COVER ANY LOSS THAT RESULTS FROM A
      PERIL EXCLUDED OR LIMITED BY THIS POLICY, EVEN IF A
      COVERED PERIL IS A CONCURRENT CAUSE OF LOSS

. . .

C.    WE DO NOT COVER:

    7.    LOSS CAUSED BY:

        a.    WEAR AND TEAR, MARRING, DETERIORATION, OR
              FAILURE TO MAINTAIN;
        b.    INHERENT VICE, LATENT DEFECT, MECHANICAL
              BREAKDOWN;
        c.    SMOG, RUST OR OTHER CORROSION, MOLD,
              FUNGUS, WET OR DRY ROT;
        . . .
        f.    SETTLING, CRACKING SHRINKING, BULGING OR
              EXPANSION OF DRIVEWAYS, ROADWAYS,
              WALKWAYS, PAVEMENTS, PATIOS, FOUNDATIONS,
              WALLS, FLOORS, ROOFS OR CEILINGS;
        . . .

(Exhibit "C" at Page 7 of 21.)

COVERAGE C PERSONAL - PROPERTY

We insure for direct physical loss to property described in Coverage C caused only by the
perils named below, unless excepted or excluded by **SECTION I EXCLUSIONS:**

. . .

2.    Windstorm or hail.

. . .

(Exhibit "C" at Page 9 of 21.)

12

The policy further provides certain conditions that the insured must meet in order to obtain coverage under the policy:

SECTION I - CONDITIONS

. . .

2.    **Your Duties After Loss.** In case of a loss to which this insurance may apply, you shall see that the following duties are performed:

   . . .
   d.    (1)    PROTECT THE PROPERTY FROM FURTHER DAMAGE;

        (2)    MAKE REASONABLE AND NECESSARY REPAIRS TO PROTECT THE PROPERTY;

. . .

(Exhibit "C" at Page 11 of 21.)

The only covered loss in reference to the plaintiffs' claim is storm-related damage. After a full and complete investigation, Standard Fire determined that only a portion of the damages that the plaintiffs claimed was covered under the policy. Thereafter, Standard Fire paid the plaintiffs' $37,318.13, representing the amount of damage to their home determined to be a result of the storm.

Richard Steed, a civil engineer who performed an inspection of the plaintiffs' property, determined that "the house did not sustain significant damage associated with the storm event." (Exhibit "B.") Mr. Steed's report discusses the various damage he noted during his inspection, and it provides explanations as to why much of the damage is not attributable to the storms associated with Hurricane Ivan. (Exhibit "B.") After his inspection of the subject property, Mr. Steed provided, in part, the following conclusions:

Conclusion:

Based on our review of the premises, our opinions are as follows:

1.  We believe the lifted metal roof in from center and damage to the metal roof at the rear right corner to be related to the storm event. <u>We noted roof leakage only from the damaged area at the rear right corner of the roof.</u> This is evident from our inspection of the attic space in this area.

2.  We believe the water staining on the ceiling on the 1st and 2nd floors in the rear right portion of the house is most likely from the roof damage or water making it's way under the 2nd floor window getting to the 1st floor ceiling. it is possible some of the staining on the 1st floor ceiling could be previous from leaks around the 2nd floor window but the recent roof leakage can not be ruled out. <u>We did not note water damage to the walls or floor in this area. The damage to the wall under the 2nd floor window appears to be from previous leakage around the window. This is evident from the repairs made to the wood planking in this area.</u>

3.  We believe the ceiling damage in the kitchen was caused from water blown under the flashing above this area and leaking onto the ceiling. <u>We did not note damage to the walls, floor, or cabinets in this area.</u>

4.  <u>In our opinion, the house did not obtain significant damage associated with the storm event.</u> The walls, ceilings, and flooring appeared to have been refinished recently. The boards in general were buckled slightly and cupped in most areas. In some areas we noted caulk protruding from joints at corners and between boards. <u>We believe the buckling and cupping has been caused from temperature differences created in the home since the upgrades to the heating and cooling systems.</u> This is typical in older homes that are not energy efficient or in which do not have insulated wall cavities.

5.  We believe the home has had foundation issues in the past since we noted that the home had been recently leveled. There were newer foundation block supports and floor joists in-place indicating recent repairs. <u>We noted areas of deterioration to older floor joist and sills from insect infestation and a possible drop in the foundation towards the front right associated with this damage.</u> This is discussed in more detail above.

6.  We checked the plumbing underneath the home and did not note any movement from the recent storm event. Additionally, <u>we noted no movement to leveling wedges or underlying supports from the recent storm event.</u> (emphasis added.)

. . .

(Exhibit "B.")

In addition to the information provided by Mr. Steed, Standard Fire also received a repair-cost estimate from Daniel Engel of Gulf States regarding the costs associated in repairing those damages at the plaintiffs' home that were storm related and, therefore, covered damages. (Exhibit "G.") Based on the documentation received from Mr. Engel, Standard Fire paid the plaintiffs for the amount of their covered loss to their home, minus their deductible. (Exhibit "E.") Standard Fire also paid the plaintiffs for the covered loss of their personal property in the full amount submitted by the plaintiffs. (Exhibit "E.") In addition, Standard Fire paid the plaintiffs for their additional living expenses and for costs incurred in moving out and back into the residence. (Exhibit "E.") The plaintiffs do not dispute the amounts paid by Standard Fire for additional living expenses and personal property loss. (Exhibit "E" at Bates No. SF 0056.)

In Employers Mutual Casualty Company v. Mallard, 309 F.3d 1305 (11th Cir. 2002), the Eleventh Circuit held:

> Under Alabama law, the burden is on the insured to establish coverage exists under an insurance policy. See Life & Casualty Ins. Co. of Tenn. v. Garrett, 250 Ala. 521, 35 So. 2d 109,111 (Ala. 1948); see also Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc., 990 F. 2d 598, 602 (11th Cir. 1993) (citing Colonial Life & Accident Ins. Co. v. Collins, 280 Ala. 373, 194 So. 2d 532, 535 (Ala. 1967)).

Mallord, 309 F.3d at 1307. In determining those damages that were covered under the policy, Standard Fire relies on the Insuring Agreement of the policy not on any exclusionary language in the policy. Therefore, the burden remains on the plaintiffs to establish coverage. See Lawler Machine & Foundry Co. v. Pacific Indem. Ins. Co., 383 So. 2d 156, 157-158 (Ala. 1980).

Based upon controlling Alabama case law, the plaintiffs have failed to meet their burden of proof as to their breach of contract claim. The plaintiffs have failed to establish that all the damages

claimed are covered under the Standard Fire policy.[4] The undisputed facts show that Standard Fire did not breach the insurance contract. The plaintiffs are entitled to payment only for those damages that are attributable to a covered loss under the plain language of the policy. Standard Fire made that payment to the plaintiffs and, therefore, has met its contractual obligations under the policy. As no genuine issue of material fact exists, Standard Fire is entitled to full and final judgment as a matter of law on the breach of contract claim.

## II.     BAD FAITH FAILURE TO PAY

In Count Two of their Complaint, the plaintiffs claim that Standard Fire acted in bad faith by intentionally failing to pay benefits due under the policy. (Exhibit "A.") This type of bad faith claim is referred to as a "normal" bad faith claim. To succeed on their bad faith failure to pay claim against Standard Fire, the plaintiffs have the burden of proving each of the following: "(a) The existence of an insurance contract between the parties and a breach of that contract by the insurer; (b) an intentional refusal to pay the insured's claim; (c) the absence of any reasonably legitimate, debatable or arguable reason for that refusal; and (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason."     Simmons v. Congress Life Ins. Co. and Insurers Admin. Corp., 791 So. 2d 371, 378 (Ala. 2000) (quoting National Security Casualty Co. v. Bowen, 417 So. 2d 179, 183 (Ala. 1982)). In order to maintain a claim for bad faith failure to pay, the plaintiffs must

---

[4]In addition to failing to meet their burden of proving a breach of contract, it should also be noted that the plaintiffs failed to mitigate their damages as required by the Standard Fire policy. Under the policy, the insured, as a condition to coverage, is required to protect the property from further damage and to make necessary repairs to protect the property. (Exhibit "C" at Page 11 of 21.) The plaintiffs admit that they were told when they first reported the loss to take these actions if necessary. (Exhibit "D" at Page 1.) However, the plaintiffs did not take these actions. In Mr. Bridges's report of December 17, 2004, he notes that there had been no temporary repairs to the roof as of December 8, 2004, the date of his inspection. (Exhibit "F.")

prove that there is no issue of fact regarding the validity of the claim and that they are entitled to a directed verdict on the breach of contract claim. See National Sav. Life Ins. Co. v. Dutton, 419 So. 2d 1357, 1362 (Ala. 1982).

Alabama courts afford insurance carriers full entitlement to rely on the terms and defenses set out in the contract. Alabama does not permit the imposition of damages for bad faith based on a legitimate interpretation of the provisions of the insurance contract. "'[I]f any one of the reasons for denial of coverage is at least "arguable" this Court need not look any further,' and a claim for bad faith refusal to pay the claim will not lie." ALFA Mutual Ins. Co. v. Smith, 540 So. 2d 691, 695 (Ala.1988) (quoting McLaughlin v. Alabama Farm Bureau Mut. Cas. Ins. Co., 437 So. 2d 86, 91 (Ala.1983)); see also Liberty National Life Ins. Co v. Allen, 699 So. 2d 138 (Ala. 1997). In other words, even if the insurer is in error in its denial of coverage, and even if its coverage analysis is eventually proved incorrect or flawed, no bad faith liability will attach if the insurer's position was "at least arguable." Applying this rule of law to the undisputed facts of this case shows that the plaintiffs have failed to meet their burden. The plaintiffs failed to present any evidence that Standard Fire lacked a debatable reason for its decision to pay only that portion of the damages alleged by the plaintiffs that were attributable to the storm. The undisputed facts show that Standard Fire had a legitimate arguable reason for paying only those portions of the plaintiffs' claims that were directly attributable to the storm, which was the only covered cause of loss under the Standard Fire policy.

Alabama courts impose a heavy burden of proof on plaintiffs asserting a claim for bad faith. LeFevre v. Westberry, 590 So. 2d 154, 159 (Ala.1991). The plaintiff must carry the burden of establishing not only that the insurer was wrong in its position, but also must further carry the heavier burden of establishing that the insurer had no legal or factual defense to the claim. That is,

17

the plaintiff must prove the absence of even so much as a debatable reason in law or fact for the denial. "[P]laintiff must show that the insurer's decision not to pay was without any ground for dispute." LeFevre, 590 So. 2d at 159. "'[T]he insured must eliminate any arguable reason propounded by the insurer for refusing to pay the claim.'" LeFevre, 590 So. 2d at 159 (quoting Burns v. Motor Ins. Corp., 530 So. 2d 824, 827 (Ala. Civ. App. 1987)).

From the infancy of the tort of bad faith, the Alabama Supreme Court has stressed the heavy burden that must be carried by a plaintiff seeking to prove a claim of bad faith. In National Security Fire & Casualty Co. v. Bowen, 417 So. 2d 179 (Ala. 1982), the Alabama Supreme Court discussed the burden that must be met by a plaintiff to recover under a theory of bad faith:

> [T]he plaintiff must show that the insurance company had no legal or factual defense to the insurance claim. The "debatable reason" . . . above means an arguable reason, one that is open to dispute or question.

Bowen, 417 So. 2d. at 183. In Jones v. Alabama Farm Bureau Mutual Casualty Co., 507 So. 2d. 396 (Ala. 1986), Chief Justice Torbert stated, "a bad faith claim under Alabama law 'ultimately depends upon whether there is a debatable reason for denying the claim.'" Jones, 507 So. 2d at 402 (Torbert C.J., concurring specially). The Alabama Supreme Court has continued its adherence to this basic principle: "[P]roof of mere negligence or mistake is not sufficient to support a claim of bad faith; there must be a refusal to pay, coupled with a conscious intent to injure." Davis v. Cotton States Mut. Ins. Co., 604 So. 2d 354, 359 (Ala. 1992).

The plaintiffs in this case cannot meet the required burden of proof under the facts presented. Standard Fire conducted a thorough investigation of the plaintiffs' claims. As a result of inspections of the plaintiffs' home, Standard Fire was provided with reports that concluded that only some of the damage alleged by the plaintiffs was related to storms associated with Hurricane Ivan. Because

the storms were the only covered losses under the policy, the remainder of the plaintiffs' claims were not covered under the Standard Fire policy. Therefore, no genuine issue of any material fact exists as to any elements of the plaintiffs' bad faith failure to pay claim against Standard Fire, and Standard Fire is entitled to judgment as a matter of law.

## III.   BAD FAITH FAILURE TO INVESTIGATE

In Count Three of their complaint, the plaintiffs claim that Standard Fire, in bad faith, failed to fully investigate the plaintiffs' claim. (Exhibit "A" at ¶ 16.) This allegation is an attempt by the plaintiffs to characterize this case as an exception to the "normal" bad faith claim, to which the "directed verdict standard" applies, and characterize it as an "abnormal" case, to which the "directed verdict standard" does not apply. In a recent case before this Court regarding claims of bad faith, the Court stated:

> [T]he Alabama Supreme Court has identified exceptions, or "abnormal" cases, in which bad faith can consist of: (1) intentional or reckless failure to "properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review," Thomas v. Principle Financial Group, 566 So. 2d 735, 744 (Ala. 1990); (2) the manufacture of a debatable reason to deny a claim, Slade, 747 So. 2d at 306; or (3) reliance on a "subjective belief" that an ambiguous portion of a policy provides a basis for denying a claim. Id.

Black-Gammons v. Zurich American Ins. Co., 2006 LEXIS 1942 (M.D. Ala. 2006).

The only allegations made by the plaintiffs in their complaint regarding bad faith are allegations that Standard Fire failed to pay policy benefits due under the policy and that Standard Fire failed to fully investigate the plaintiffs' claim. (See Exhibit "A" at ¶ 16.) Therefore, the only allegation made by the plaintiffs that could conceivably make this case an exception to the "normal" bad faith case, governed by the directed verdict standard, is the plaintiffs' allegation that Standard

Fire failed to fully investigate the plaintiffs' claim. The undisputed facts of this case do not support this allegation.

After receiving the plaintiffs' report of loss, Standard Fire retained independent adjustors, engineers, an electrician, and a cost estimator to inspect the subject property and fully investigate the plaintiffs' claims. (See Exhibits "B," "F," "G," and "H." ) While these inspections revealed some storm damage, they also revealed damage that occurred prior to Hurricane Ivan, as well as extensive termite damage. (See Exhibits "B," "F," "G," and "H.") Much of the damage to the home's interior could not be related to storm damage. (Exhibit "B" and "G.") The storm-related damage was classified as not "significant." (Exhibit "B.")

In West Beach Development Co., L.L.C. v. Royal Indemnity Co., 2000 LEXIS 13596 (S.D. Ala. 2000), the plaintiff sued the defendant for, among other things, breach of contract and bad faith regarding the plaintiff's claim for damage to its hotel from a hurricane. After having several inspections conducted of the damaged property, the defendant determined that the damage was not due to a covered loss under the insurance policy. In discussing the plaintiff's claim for bad faith failure to investigate, the court held:

> In order to recover under a theory of an abnormal case of bad-faith failure to investigate an insurance claim, "the insured must show (1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim. . . . When the Alabama Supreme Court recognized the tort of bad faith in this context, it intended to limit liability under that tort to those instances in which the insured's losses were covered under the policy."

West Beach Development Co., 2000 LEXIS 13596 at *16 (further citations omitted). "The 'primary' consideration in this type of bad faith case is whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review. .

. . If plaintiff's evidence 'fails to eliminate any arguable reason on a matter of fact or a matter of law, [plaintiff] cannot recover under the tort of 'bad faith. . .'." Id. at *18 (further citations omitted.)

In the present case, the evidence establishes that Standard Fire properly investigated this claim. Numerous inspections were performed by persons with various areas of expertise in an effort to fully investigate the plaintiffs' claims and determine what, if any, damage was covered under the Standard Fire policy. The undisputed evidence shows that Standard Fire did not make a determination as to whether the plaintiffs' claims were covered damages until after all the inspections were concluded and after the reports were reviewed. The plaintiffs have presented no evidence that Standard Fire intentionally failed to investigate the plaintiffs' claim. The plaintiffs have further failed to present any evidence that Standard Fire failed to properly subject the plaintiffs' claim to a cognitive review. Therefore, the plaintiffs have failed to meet their burden of proving that this case presents an exception to the "normal" bad faith case. Therefore, as a matter of law, Standard Fire is entitled to Summary Judgment on the plaintiffs' bad faith failure to investigate claim.

## IV. CONCLUSION

Based on the undisputed facts, Standard Fire's evidentiary submissions, and controlling Alabama law, Standard Fire did not breach its contract of insurance with the plaintiffs and did not act in bad faith in paying only those portions of the plaintiffs' claim that were covered under the policy and did not act in bad faith in its investigation of the plaintiffs' claim. Accordingly, Standard Fire is entitled to summary judgment in its favor as to all of the plaintiffs' claims, and respectfully requests that this Honorable Court grant its motion and enter final summary judgment in favor of Standard Fire.

Respectfully submitted,


_s/ Brenen G. Ely_____
Brenen G. Ely (0366-E54B)
Joel S. Isenberg (8855-N76J)
Attorney for Defendant The Standard Fire
Insurance Company

**OF COUNSEL:**
SMITH & ELY, LLP
2000A SouthBridge Pkwy., Suite 405
Birmingham, Alabama 35209
Telephone:    (205) 802-2214
Facsimile:    (205) 879-4445

## CERTIFICATE OF SERVICE

I do hereby certify that a true and accurate copy of the foregoing has been served on all parties of record by:

|          |                    |
|----------|--------------------|
| _____  | Hand Delivery      |
| _____  | U. S. Mail         |
| _____  | Overnight Delivery |
| _____  | Facsimile          |
| X        | E-File             |

on this the 14th day of February, 2006.


_s/ Brenen G. Ely_____
OF COUNSEL

Jere L. Beasley
W. Daniel Miles, III
Christopher E. Sanspree
BEASLEY, ALLEN, CROW, METHVIN
   PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, Alabama 36103

22