WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.    7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

1 (Pages 1 to 4)



Page 1

```
 1          IN THE CIRCUIT COURT
 2                  OF
 3      MONTGOMERY COUNTY, ALABAMA
 4
 5   WILLIAM P. SANDERS,
     KIM SANDERS, WILLIAM P.
 6   SANDERS as father and
     next friend of JAKE SANDERS,
 7
         Plaintiffs,
 8
     vs.          CIVIL ACTION AT LAW
 9                CASE NO. 04-2928
10   STANDARD FIRE INSURANCE
     COMPANY, et al.,
11
         Defendants.
12
13
14        * * * * * * * * * *
15   DEPOSITION OF WILLIAM PHILLIP SANDERS,
16   taken pursuant to stipulation and agreement
17   before Wendy Lewis, Court Reporter and
18   Commissioner for the State of Alabama at Large,
19   in the Law Offices of Beasley, Allen, Crow,
20   Methvin, Portis & Miles, 272 Commerce Street,
21   Montgomery, Alabama, on Tuesday, July 19, 2005,
22   commencing at 10:21 a.m.
23        * * * * * * * * * *
```

Page 2

```
 1          APPEARANCES
 2   FOR THE PLAINTIFFS:
 3   Mr. Christopher E. Sanspree
     BEASLEY, ALLEN, CROW,
 4   METHVIN, PORTIS & MILES
     Attorneys at Law
 5   272 Commerce Street
     Montgomery, Alabama 36104
 6
     FOR THE DEFENDANT:
 7
     Mr. Brenen Ely
 8   Mr. Joel S. Isenberg
     SMITH & ELY
 9   Attorneys at Law
     2000-A SouthBridge Parkway, Suite 405
10   Birmingham, Alabama 35209
11   ALSO PRESENT:
12   Ms. Kim Sanders
13        * * * * * * * * * *
14        EXAMINATION INDEX
15   WILLIAM PHILLIP SANDERS
         BY MR. ELY            3
16
17        * * * * * * * * * *
18          STIPULATIONS
19       It is hereby stipulated and agreed by
20   and between counsel representing the parties that
21   the deposition of WILLIAM PHILLIP SANDERS is
22   taken pursuant to stipulation and agreement; that
23   all formalities with respect to procedural
```

Page 3

```
 1   requirements are waived; that said deposition may
 2   be taken before Wendy Lewis, Court Reporter and
 3   Commissioner for the State of Alabama at Large,
 4   without the formality of a commission; that
 5   objections to questions other than objections as
 6   to the form of the questions need not be made at
 7   this time but may be reserved for a ruling at
 8   such time as the deposition may be offered in
 9   evidence or used for any other purpose as
10   provided for by the Alabama Rules of Civil
11   Procedure.
12       It is further stipulated and agreed by
13   and between counsel representing the parties that
14   the filing of the deposition is hereby waived and
15   that the deposition may be introduced at the
16   trial of this case or used in any manner by
17   either party hereto provided for by the Statute.
18        * * * * * * * * * *
19        WILLIAM PHILLIP SANDERS
20       The witness, having first been duly
21   sworn to speak the truth, the whole truth and
22   nothing but the truth, testified as follows:
23
```

Page 4

```
 1          EXAMINATION
 2   Y MR. ELY:
 3   Q.  Mr. Sanders, can you please state your full
 4       name for the record?
 5   A.  Yes, sir. William Phillip Sanders.
 6   Q.  Mr. Sanders, when is your birth date?
 7   A.  April 25th, '59.
 8   Q.  Your social security number?
 9   A.  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.
10   Q.  Where are you currently employed?
11   A.  Montgomery County Sheriff's Office.
12   Q.  What do you do there?
13   A.  I'm a lieutenant, special operations tactical
14       team, undercover drugs.
15   Q.  You're going to have to slow down just a
16       little bit. Hold on.
17   A.  Okay.
18   Q.  I want to write all that down so I
19       understand. You're a lieutenant on the
20       tactical unit?
21   A.  Uh-huh.
22   Q.  Undercover drug enforcement?
23   A.  That's right.
```

2 (Pages 5 to 8)

Page 5

1  Q. Okay. Mr. Sanders, have you ever given a
2     deposition before?
3  A. Yes, I have.
4  Q. In a civil case, or did you give them in
5     criminal proceedings?
6  A. Both.
7  Q. About how many civil depositions have you
8     given?
9  A. A couple.
10 Q. Were those as a witness or as a party?
11 A. Yes, a witness.
12 Q. What kind of cases were those?
13 A. One of them right off the top of my head was
14    against Montgomery County, somebody sued
15    Montgomery County.
16 Q. And you were witness for the defense?
17 A. That's correct.
18 Q. Did all of these civil depositions involve
19    your employment?
20 A. Yes.
21 Q. Okay. So you know the drill.
22 A. Yes, sir.
23 Q. You know the deposition drill.

Page 6

1  A. Yes, sir.
2  Q. So I won't go over that with you. We know
3     not to talk over each other so she can take
4     it down, and try not to nod. And sometimes
5     these things get a little conversational --
6  A. Yes, sir.
7  Q. -- and we use a lot of nonverbals. So that
8     will make her job a little bit easier.
9        How long have you been employed with
10    Montgomery County?
11 A. Since November of 1987.
12 Q. Can you start me in November of '87 and tell
13    me the different -- how you've progressed to
14    this point in your career.
15 A. Okay. When I started, I started out working
16    in the jail. Then I went from the jail to
17    working patrol, and then I went from patrol
18    to working investigations. Then I became
19    supervisor. Then I went to the FBI task
20    force for a while. Then I came back and went
21    to special operations drug unit. I got
22    promoted again to lieutenant, stayed where I
23    was at in charge of special operations and

Page 7

1     assigned to the DEA team here in Montgomery,
2     Central Alabama.
3  Q. When you say you're assigned to the DEA team,
4     does that mean you work in conjunction with
5     the Federal DEA?
6  A. Yes. I'm a sworn federal officer to work on
7     the task force.
8  Q. Are you paid by Montgomery County?
9  A. And by the DEA.
10 Q. Okay. When were you promoted to lieutenant?
11 A. Probably February of this -- this current
12    year.
13 Q. February 2005?
14 A. Yes, sir.
15 Q. And you told me about an FBI task force. Is
16    that similar to the arrangement you have now?
17 A. Yes. It was a violent crimes task force, and
18    that was back in '94.
19 Q. All right. How many people do you supervise?
20 A. Approximately ten.
21 Q. And you said it was undercover drug
22    enforcement?
23 A. Yes, sir.

Page 8

1  Q. Do you do undercover work, or do you just
2     supervise undercover groups?
3  A. Both.
4  Q. I'm going to go backward about your
5     employment history and your education.
6     Starting in November '87, where were you
7     before you came to Montgomery County?
8  A. Broward County Sheriff's Office in Fort
9     Lauderdale, Florida.
10 Q. How long were you there?
11 A. Several years.
12 Q. What did you do there?
13 A. Deputy.
14 Q. Okay. And where were you before that?
15 A. Hold on. It's been a while. Let me think.
16    Of course, I went to college. And I worked
17    several different places. You know, I worked
18    for a furniture company.
19 Q. Let's start out this way. It may be easier.
20    Tell me where you went to high school and
21    college, and let's go that way.
22 A. Okay. I went to Kendrick High School in
23    Columbus, Georgia.

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.                                                    7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

3 (Pages 9 to 12)

Page 9

1   Q. All right. What year did you graduate?
2   A. '77.
3   Q. Where did you go from there?
4   A. Troy State University, Troy, Alabama.
5   Q. Okay. When did you graduate from there?
6   A. '81.
7   Q. And then for the next couple of years -- as I
8       understand it, you were at Broward County a
9       couple of years before you came to
10      Montgomery, which would put us '84?
11  A. No. Actually, I was in Broward County I
12      think from '84 to -- '83 to '86.
13  Q. '83 to '86?
14  A. And that's approximately, yeah.
15  Q. Okay. So that leaves us about two years
16      between Troy State and --
17  A. That I was doing -- that's right. That I was
18      doing furniture company. I worked for a
19      place called -- hold on. I'll tell you in a
20      minute. Lummus. Lummus Industries. And
21      then I went down to Broward County and then
22      from there up to here.
23  Q. So since '83 you've been in law enforcement?

Page 10

1   A. Yes, sir.
2   Q. What was your degree at Troy State?
3   A. I -- I didn't finish.
4   Q. Okay.
5   A. It was in criminal justice is what my major
6       was.
7   Q. Are you from -- grew up in Columbus?
8   A. Yes.
9   Q. Do you have any relatives living in
10      Montgomery County?
11  A. That's a negative.
12  Q. You have two children?
13  A. Yes, sir.
14  Q. What are their ages again?
15  A. Eight and six.
16  Q. When were you and Ms. Sanders married?
17  A. '96? '96. 1996.
18  Q. Were you married before?
19  A. No.
20  Q. Okay.
21  A. Oh, yeah, I was married before. Yeah,
22      absolutely. Sorry.
23      MR. SANSPREE: Just not to her.

Page 11

1   A. Just not to her. That's correct.
2       MR. ELY: I should have asked that a
3       little bit better, shouldn't I
4       have?
5   Q. Who were you married to before that and when?
6   A. Her name was P. J. Sanders, and we was
7       married in, shoot, '94 -- '93 to '95 maybe,
8       something like that.
9   Q. Any other marriages?
10  A. No.
11  Q. Now, the best way I think to go about this --
12      I mean, I know there has been a lot that's
13      gone on in this claim.
14  A. Yes, sir.
15  Q. And the best thing I know to do is just start
16      from the very beginning. We've had a lot of
17      communications with your lawyer, so I have
18      some background information, but I want to be
19      clear on what you understand and what your
20      story is about the claim.
21  A. Yes, sir.
22  Q. Now, Hurricane Ivan, do you remember -- was
23      it September the 16th?

Page 12

1   A. Yes, sir.
2   Q. Tell me about the storm itself.
3   A. Well, like you said, it come in September
4       16th. And, obviously, it was -- in Pike
5       Road, Alabama, it was -- it was awful. It
6       hit my house early that morning. My wife and
7       kids were there and looked outside and we
8       could see the background was covered with
9       shingles. There was water coming in the
10      roof. There was water coming in the windows,
11      every window in the house. There was water
12      coming through the roofs of every room. We
13      had a mess.
14  Q. You were at home that day?
15  A. For a few minutes, and then I got called to
16      work in the middle of this.
17  Q. Let me digress just a minute.
18  A. Okay.
19  Q. When did y'all move into this house?
20  A. 2001.
21  Q. Was this a new build?
22  A. No. It was -- somebody had -- was living in
23      it. It was a new home, but it was a couple

| Page 13 | Page 15 |
|---|---|

**Page 13**

1    of years old, yeah.
2  Q. Do you know who you bought it from?
3  A. I do. The guy who owned it. I mean, I
4    didn't -- his name was Larry Haverland.
5  Q. Haverland?
6  A. That's correct.
7  Q. Do you know when the house was built?
8  A. Approximately '99.
9  Q. Do you know who built it?
10  A. Watts. Watts Realty.
11  Q. Did you have an inspection performed on the
12    house?
13  A. Yes, sir.
14  Q. Who did that inspection?
15  A. I couldn't tell you his name. I -- I don't
16    know.
17  Q. Would you have documents that would tell me
18    that?
19  A. Everything that I have, I've turned over to
20    my attorney.
21  Q. And nothing came up in the inspection that
22    you can recall?
23  A. No, sir.

**Page 14**

1  Q. And do you know what month y'all moved in?
2  A. November? I believe it was November 2001.
3  Q. And from November 2001 up to September the
4    16th, 2004 --
5  A. Yes, sir.
6  Q. -- have you ever had any repairs done on the
7    house?
8  A. When you say -- did I do it personally, or
9    did I file a claim on it, or I don't --
10  Q. No. Anything -- well, let's first start with
11    anything you've done other than changing out
12    a, you know, toilet mechanism or something
13    minor like that. I'm talking about some
14    repairs.
15  A. Minor repairs like you said, you know.
16  Q. No roof repairs, no interior -- major
17    interior repairs?
18  A. No, sir.
19  Q. Okay. Had you ever had any water come in the
20    house from any other storm before this one?
21  A. No, sir.
22  Q. So you were called out to work during the
23    middle of the storm?

**Page 15**

1  A. Yes, sir.
2  Q. And your wife and kids stayed at the house?
3  A. Yes, sir.
4  Q. Did you take any measures at that point
5    before you left to do anything about the
6    water coming in or --
7  A. I put some buckets up in the attic, yes, sir,
8    towels down by the windows, the doors.
9  Q. When you left, describe for me what it looked
10    like. And start from the top in the attic.
11    And I know you said you had buckets down.
12    Did you have buckets under every leak you
13    could see?
14  A. Under every leak I could see, I tried to
15    bucket; but you've got to understand when I
16    left, the storm was progressively getting
17    worse. When I walked outside to leave, there
18    were just numerous shingles missing from the
19    home, numerous shingles standing straight up
20    that had broken the tab, that were flapping
21    and water pouring in them. That's the way it
22    was when I left.
23  Q. Okay. What did the downstairs look like?

**Page 16**

1    How much water did you have down there?
2  A. I had water coming in the windows, through
3    the windows, through the doors. It was
4    awful. The rooms were getting wet. The --
5    the roof was starting -- the roof in every --
6    the ceiling in every room was starting to
7    leak water, drip water.
8  Q. Okay.
9  A. And like I said, I had to go to work. So --
10  Q. I understand you had some carpet in the
11    house, and you had some of it hardwood and
12    some of it -- how much water was on the
13    floors that you can recall, if any?
14  A. Yes. It was -- it was -- I mean, it was
15    covered with water just to answer your
16    question. I mean, I didn't measure it,
17    obviously.
18  Q. Right.
19  A. But yes, the -- the foyer area was covered.
20    And like I say, sir, water was coming in
21    the -- the -- the windows as I left. The
22    storm was -- the storm had not even got as
23    worse as it was going to get. Obviously,

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.
DEPOSITION OF WILLIAM P. SANDERS

7-19-2005

5 (Pages 17 to 20)

Page 17

1  that's why we get called out before the worst
2  of it hit. And that's where it was at when I
3  left.
4  Q. Was there water on the floors of every room?
5  A. I don't say there was water on the floor of
6  every room at that time. There was water in
7  the roof of every room at that time.
8  Q. I got that. I'm just working my way down.
9  And were there areas of the carpet that were
10  already soaked?
11  A. Yes, sir.
12  Q. Okay.
13  A. And I want to tell you, my wife and kids were
14  scared to death; and they were very upset and
15  crying. And, of course, I had no option as
16  but to -- you know, I was put on alert and I
17  was made to go to work. So, that's how the
18  house was when I left. And my wife actually
19  called several hours later and made the claim
20  with -- with Standard Fire.
21  Q. Do you know about what time it was that day?
22  I -- I can remember when it got -- and I'm
23  just trying to get a time frame, because I

Page 18

1  remember when it came through Birmingham, and
2  I still have it in my mind when it kind of
3  came through here. I'm just trying to get an
4  idea when you left, how long it lasted, and
5  kind of when it subsided.
6  A. I don't recall what time I left. I know that
7  I got home -- I was allowed to come home for
8  a while to do something with my house. And I
9  brought my team of people, and we got up on
10  my roof. Of course, the wind was still
11  blowing absolutely awful. And we tarped it.
12  We tarped that roof. We went and got tarps,
13  and we tarped my roof. And, of course, I may
14  be getting ahead of myself but --
15  Q. That's all right. You tarped the roof that
16  day?
17  A. Absolutely.
18  Q. That afternoon?
19  A. Absolutely.
20  Q. And you brought all your guys with you?
21  A. Uh-huh.
22  Q. Ten of them, about?
23  A. Yeah, approximately. Most of them.

Page 19

1  Q. Did you lose power in the storm?
2  A. Yes, sir.
3  Q. Was power out before you left?
4  A. I don't recall.
5  Q. How long were you without power?
6  A. Probably till the next night.
7  Q. All right. So you came back that afternoon,
8  tarped the roof with your guys. Then you had
9  to go back to work?
10  A. Uh-huh.
11  Q. When was the next time -- when did you get to
12  finally come back home?
13  A. That night.
14  Q. That night?
15  A. I came home that night.
16  Q. And when you came back home after you had
17  tarped the roof, did you do any -- was there
18  anything you could do?
19  A. I did. The first thing I did was take my
20  family to a motel room and put my family up.
21  I called my brother, a friend of mine, my
22  father-in-law. All of them came down the
23  next morning and we started cleaning. We

Page 20

1  started pulling carpet. We come in there
2  with fans and generators and wetbacks. And
3  we went up in the attic and we started trying
4  to save -- salvage what we could of that
5  house. For three days, we did that.
6  Q. You said your brother, your friend, your
7  father-in-law, and you.
8  A. Uh-huh.
9  Q. Right? And they came from where?
10  A. My brother came from Mark, Alabama. My
11  father-in-law came from Richland, Georgia.
12  And my friend came from Montgomery.
13  Q. And so you had generators out there the next
14  day; and then you got the power on later on
15  that night; and you were running wetbacks,
16  fans and you pulled carpet. Do you remember
17  the areas of the house -- and this may be the
18  best way to go about it.
19  Let me have those. I have a diagram of
20  your house, and this may be an easy way to
21  walk through it. I ran copies off; but, you
22  know, now I can't find them.
23  (Brief pause)

Page 21

1      MR ELY: We'll just go ahead and mark
2        it as Defendant's Exhibit #1.
3   Q. The document that I've marked as Defendant's
4      Exhibit #1 -- I'm not asking you whether the
5      measurements are correct. I'm just asking
6      you if this is the general floor plan of your
7      house.
8        MR. SANSPREE: Walk in like that.
9   A. Walk in where? Right here?
10  Q. Yes, sir.
11       MR. SANSPREE: Walk in right here.
12  A. That looks approximately, it, yes.
13  Q. Okay. Now, when you said y'all were pulling
14     up carpet, what areas of the home on this
15     diagram had carpet in them at the time?
16  A. The -- every bedroom, the hallway, the
17     bathrooms, the living room, this dining room.
18  Q. You --
19       MR. SANSPREE: I was going to tell you
20         just when you point to it, be
21         specific for the record.
22  A. Okay.
23  Q. Let me ask it this way. Is it fair to say

Page 22

1      that the only area that was not carpeted was
2      probably the foyer?
3   A. And the kitchen.
4   Q. And the kitchen? That's probably the easier
5      way to go about it, then. Did you pull
6      carpet out of all these areas?
7   A. Yes. Some more than others.
8   Q. Are there any rooms you can look at on that
9      diagram and tell me that you pulled all the
10     carpet out of?
11  A. Yes.
12  Q. Which ones were those?
13  A. The girl's and the boy's and most of -- well,
14     all of it in those two rooms, and most of it
15     in the living room and most of it in this
16     dining room, mostly all the hallway, this
17     exercise room, part of our bedroom and part
18     of the bath -- two bathrooms.
19  Q. When you pulled the carpet -- you pulled the
20     carpet and the pad out, did you try to dry it
21     or did you just pull it out?
22  A. We tried to dry it.
23  Q. Did you pull fans into -- let me back up.

Page 23

1      Does it sit on concrete?
2   A. The slab.
3   Q. The carpet sits on concrete?
4   A. Uh-huh.
5   Q. Did you bring the fans in there to try to dry
6      out the concrete?
7   A. Uh-huh.
8        MR. SANSPREE: Answer out so she can
9          type it down.
10  A. Yes.
11  Q. Where did you take the carpet to try and dry
12     it out?
13  A. Outside.
14  Q. Just out in the yard?
15  A. Uh-huh.
16  Q. And as I recall, right after Hurricane Ivan
17     came through, we had pretty good weather for
18     several days. It was pretty sunny. And was
19     it dry? Do you remember?
20  A. I believe so. I don't know.
21  Q. Well, the carpet didn't get wet again out
22     there?
23  A. No. No.

Page 24

1   Q. So you pulled carpet. You brought in fans in
2      the downstairs. Is there anything else you
3      did in those three days, or four, on the
4      downstairs? And that takes into
5      consideration you moved furniture --
6   A. We moved --
7   Q. -- and all that type of stuff out of the way.
8   A. Yes, we done plenty.
9   Q. Okay. So aside from moving furniture, moving
10     carpet, you basically reduced it down to the
11     slab and tried to dry it --
12  A. Yes, sir.
13  Q. -- the downstairs?
14  A. Right. We moved stuff. We wiped stuff off.
15     We moved it again. We wiped it again. You
16     have to understand that the ceiling -- the
17     attic was so wet that it just continued to
18     leak. I mean there -- there was nothing I
19     could do to get the -- all that insulation
20     was wet, and it -- there was no way I
21     could -- to dry it.
22  Q. So for the three days that y'all continued to
23     work, despite the fact that you pulled all

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 36104
ph: (334) 263-0261; fax 263-1243

Page 25

1    that stuff out, your ceilings kept dripping?
2  A. Yeah.
3  Q. Did you lose any ceiling pieces? Did any of
4    them collapse, or you just --
5  A. Yes. In the air handler room, several pieces
6    collapsed.
7  Q. Where is the air handler room?
8  A. It's down this hallway right before you get
9    to my son's -- right after the foyer, in
10   between the -- and of course this bedroom.
11   It's between the boy's bedroom and this
12   hallway. It's in this hallway right here.
13 Q. Can you mark that with an X and then put out
14   beside -- just write what it is for me.
15   Sometimes in that middle there, it's hard to
16   read.
17 A. Uh-huh.
18 Q. And that ceiling collapsed? That --
19 A. Part of it, yeah.
20 Q. All right. So in this area, we've gotten
21   what you did downstairs. In the attic, tell
22   me what y'all did.
23 A. Well, we got up there, and we moved clothes

Page 26

1    and boxes and stuff that we had up there,
2    moved all that stuff out and brought it down
3    and -- and tried to dry it and salvage what
4    we could. I mean, you have to understand
5    that the -- the roof -- the ceiling was
6    just -- the attic was -- was devastated. I
7    mean, it was just --
8  Q. Did you pull any of the insulation out?
9  A. No.
10 Q. Did you put fans in the attic?
11 A. We stuck one up there, and it was just --
12   we -- after a little while, we had it up
13   there at the top; and we just figured it was
14   futile because -- number one, because the --
15   the insulation is blown, not rolled. So if
16   it -- if it did dry enough, then it started
17   blowing, what pieces were starting to dry; so
18   we -- we had to stop.
19 Q. All right. And you mentioned clothes in the
20   attic. Did you remove clothes from the
21   downstairs closets as well?
22 A. Yeah.
23 Q. From every closet or just some of the areas?

Page 27

1  A. Most every closet. The closets were not
2    as -- did not get as soaked, obviously, as
3    the attic. I don't think we lost anything
4    out of the closets, per se.
5  Q. Okay.
6  A. The clothes and stuff we lost were mainly
7    like winter clothes and stuff that we had
8    stored up in the attic.
9  Q. Would you say that you lost most all the
10   clothes that were up there, that were up --
11 A. That was up in the attic, yes, sir.
12 Q. What else was up in the attic that you can
13   remember that you lost?
14 A. We had Christmas decorations. We had, you
15   know, knickknack stuff. Of course there were
16   shoes up there; you know, kid's stuff, games.
17 Q. Attic stuff?
18 A. Yes, sir.
19 Q. So we've gotten to -- you told me you worked
20   about three days on getting all that stuff
21   out.
22 A. Yes, sir.
23 Q. And in the meantime, I believe you told me

Page 28

1    that your wife had filed an insurance claim.
2  A. She filed it that day, yes, sir.
3  Q. The day of the hurricane?
4  A. Yes, sir.
5  Q. When were you first contacted by someone
6    about the adjustment of your claim?
7  A. When did I contact somebody? Is that what
8    you mean?
9  Q. When were you contacted?
10 A. I wasn't contacted.
11 Q. Someone eventually came out?
12 A. Yeah. Almost a month later, they sure did.
13 Q. Did you have any contact from the date of the
14   hurricane -- or from this time y'all were in
15   the hurricane -- with anyone at Standard Fire
16   before someone came out, this interim period?
17 A. Yes, sir, I did.
18 Q. Who did you talk to?
19 A. I talked to several.
20 Q. Can you remember? Can you try and remember
21   for me who you talked to and when, as best
22   you can?
23 A. I believe the first person -- well, the first

Page 29

1    person I talked to obviously was someone who
2    was just answering the phone, that I was
3    asking about my claim; and she said -- I
4    called her that Monday morning or that
5    Sunday. And she said that my claim had been
6    reassigned to a fellow by the name of Tim
7    Buhlert.
8    Q. And you think this was probably on Sunday
9       night after the storm?
10   A. Uh-huh, or Monday morning. And that someone
11      would be in contact with me shortly.
12   Q. And did you have another conversation with
13      someone at Standard Fire after that?
14   A. I did.
15   Q. When was that? Do you remember?
16   A. I called maybe a week later and said, I
17      haven't heard from anyone; could you check
18      the status of my claim? And she said -- the
19      operator said, sir, you need to understand
20      something. We've had a hurricane, several
21      hurricanes, and we're busy. We'll get there
22      as soon as we can
23   Q. Okay.

Page 30

1    A. You will hear from someone. I said, okay,
2       thank you.
3    Q. Did you have any conversations during -- and
4       I'm just -- this is about 10 days -- the
5       first 10 days with your insurance agent
6       during the time?
7    A. No. I don't believe I called her at that
8       time.
9    Q. So we're about 10 days out. They're telling
10      you just to wait. And they've told you
11      already that Tim Buhlert has been assigned to
12      the claim?
13   A. Yes, sir.
14   Q. And did you have to make another call?
15   A. I started calling Mr. Buhlert. They gave me
16      his number.
17   Q. Did they give you the number on the first
18      conversation or the second one, or do you
19      remember?
20   A. I don't remember.
21   Q. By this 10-day period you had his number?
22   A. Yes.
23   Q. So you started calling Tim Buhlert?

Page 31

1    A. Every day.
2    Q. Okay.
3    A. And he would inform me, I will call you
4       tonight when I get in.
5    Q. Okay.
6    A. And this went on for approximately two more
7       weeks.
8    Q. And when he would say, I will call you when I
9       get in at night, would he return your call?
10   A. No.
11   Q. Okay.
12   A. And in the meantime, my house was stinking,
13      smelling. It had done got hot, as you
14      mentioned earlier, and nice weather. Well,
15      somebody -- a carpet man informed me later,
16      you can't dry that padding; it's sour. My
17      whole house was sour. My attic was sour.
18      And I was still calling Standard Fire, and
19      they still wasn't helping me.
20   Q. Who was this carpet man that you talked to?
21   A. I believe he was the carpet man that
22      Mr. Buhlert had come out there when
23      Mr. Buhlert suggested to Mr. Chuck Brown of

Page 32

1       ICA that the Sanders' home probably needs
2       mold remediation, and he turned him down.
3    Q. So the carpet person who told you that the
4       carpet was ruined was someone that Tim
5       Buhlert brought out there during the
6       adjustment period? Is that right?
7    A. Said it was --
8    Q. You need to answer out loud.
9    A. Yes. Said it was delaminated
10   Q. Okay.
11   A. But -- and I'm sorry. I'm getting ahead of
12      myself.
13   Q. That's all right. That's all right.
14   A. Let me slow down.
15   Q. That's all right. We'll get there. All
16      right. I've got -- I'm up to this 10-day
17      period. And I want to back up for just a
18      minute.
19   A. Okay.
20   Q. You had the carpet out on the lawn for three
21      days afterward?
22   A. I'd say the driveway, not the lawn.
23   Q. Well, out from the house.

WILLIAM P. SANDERS, ET AL. v STANDARD FIRE INS. CO., ET AL.    7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

9 (Pages 33 to 36)

| Page 33 | Page 35 |
|---|---|
| 1  A. Yes, sir. | 1  house to -- in an attempt to stop the rain |
| 2  Q. On the lawn somewhere. | 2  coming in when it did rain and that he was |
| 3  A. Yes, sir. | 3  charging $200. And they informed me, yes, |
| 4  Q. At some point, did you bring the carpet back | 4  sir, you can. And just as a side note, they |
| 5     in and reinstall it? | 5  hadn't paid that $200 to this date either. |
| 6  A. Uh-huh. | 6  Q. Okay. When did you -- and I think I've |
| 7  Q. When did you do that? | 7     seen -- what was that roofer's name? Do you |
| 8  A. Just as we would get it as dry as we figured | 8     remember? |
| 9     we could get it, we would bring it back in. | 9  A. The one that put the temporary roof up |
| 10 Q. Was that during this three-day period or was | 10    there? |
| 11    it over the next 10 days? | 11 Q. Yes, sir. |
| 12 A. Some of it probably about the third day and | 12 A. His last name was -- I'll tell you his name. |
| 13    some of it a couple of days later. | 13    Hold on. It's Laird Bone. Laird Bone. |
| 14 Q. So within a week you probably had it all back | 14 Q. When did he -- |
| 15    in? | 15 A. L-A-I-R-D, Bone. |
| 16 A. I did. I did. | 16 Q. When did he come out? |
| 17 Q. All right. And you said by this second | 17 A. It was -- I don't recall the exact date. |
| 18    conversation with Travelers, or Standard | 18    It's on the paperwork. |
| 19    Fire, about 10 days later your house had | 19 Q. Was it -- |
| 20    begun to smell? | 20    MR. SANSPREE: It was about the 22nd. |
| 21 A. Yes, sir. | 21 Q. Yeah. It was within this 10-day period? |
| 22 Q. Had you made inspections up in the attic over | 22 A. Yes. |
| 23    this 10-day period to look at the insulation | 23 Q. Pretty quick? |

| Page 34 | Page 36 |
|---|---|
| 1     and see how much water was up there, how damp | 1  A. Yes. And he informed me, Mr. Sanders, I am |
| 2     it was? | 2     going to replace the shingles that are gone. |
| 3  A. Yes, sir. | 3     Your roof is in bad shape, so you probably |
| 4  Q. About how often would you do that? | 4     are going to have leaks in other places. So |
| 5  A. On occasion. It didn't change. | 5     by me tacking what I'm going to temporarily |
| 6  Q. So with this 10-day period, when you think | 6     repair, it's not going to solve your problem. |
| 7     maybe the second conversation with Standard | 7  Q. Okay. |
| 8     Fire, you had seen the attic and the | 8  A. And I passed that on to Standard Fire. |
| 9     insulation was still wet? | 9  Q. How long did it take him to make the |
| 10 A. Yes, sir. | 10    temporary repairs he made? Was it one day? |
| 11 Q. Were the ceilings in the bedrooms still wet | 11 A. One day, yes, sir. |
| 12    or dripping with water? | 12 Q. And how long were the tarps up on the roof? |
| 13 A. Some were still wet. I would -- I don't | 13 A. Until he put that up. |
| 14    recall the exact date they stopped leaking, | 14 Q. All right. So I'm back to the 10-day period |
| 15    but they were still wet, yes, sir. | 15    when you started calling Mr. Buhlert every |
| 16 Q. Okay. | 16    day? |
| 17 A. And they continued to get wet every time it | 17 A. Yes, sir. |
| 18    rained. | 18 Q. And you said this went on for about two |
| 19 Q. All right. | 19    weeks? |
| 20 A. And I did call Standard Fire again and ask | 20 A. I'd say three -- well, two from the time I |
| 21    them because -- would it be okay if I call -- | 21    started calling him. Yeah, two more weeks. |
| 22    if I got a roofer to my house to put up a | 22 Q. Two more weeks. |
| 23    temporary -- to put temporary shingles on my | 23 A. So it had been three weeks since it started. |

**Page 37**

1 Q. And during this two-week period from the 10
2 days until the time he got out there, had you
3 done anything else on the house in terms of
4 repairs or --
5 A. Yes, sir.
6 Q. -- other than you described? Tell me what
7 you did.
8 A. Yes, sir. I took caulking up in the attic in
9 an attempt to caulk where, you know, water
10 had been coming in. I got up there and
11 started turning the insulation in an attempt
12 to help it dry because the smell was so -- so
13 awful in our house. Some of my friends had
14 suggested that to try to help it dry out, get
15 up there with towels. I got up there with
16 towels. I started soak -- getting the water
17 soaked up and turning the insulation in an
18 attempt to dry it. I probably did that -- I
19 did that a lot.
20 Q. Anything else besides that in that period of
21 time that you did?
22 A. Say your question again. I'm sorry.
23 Q. Is there anything else that you did during

**Page 38**

1 that period of time, that two-week period
2 when you were calling Mr. Buhlert, aside from
3 turning over the insulation and trying to
4 caulk in areas to stop the leaks?
5 A. Yes, sir. I did something every day. I
6 attempted -- I went around my house. My
7 house is in total disrepair. I tried to -- I
8 tried to fix the windows. I tried to caulk
9 some windows. I tried to always get up under
10 the cabinets to get water out. Every day,
11 every day we were attempting to do something
12 to that house.
13 Q. And so finally Mr. Buhlert came out?
14 A. Well, there are several things that lead up
15 to him coming out if you want to hear them.
16 Q. Okay. Sure.
17 A. Okay. He finally called after I called -- he
18 was supposed to come. He told me, I will be
19 there on a Friday morning at eight o'clock.
20 And I said -- and I think that was around the
21 7th or 8th of October. And I said, well,
22 great. So I took off work. And at 11:30
23 Mr. Buhlert wasn't there, hadn't heard from

**Page 39**

1 him; he hadn't called; he wouldn't answer his
2 phone. So that's when I made my first trip
3 to the Pinckard Agency and spoke with
4 Ms. Selia Courson and Ms. Marti Washing,
5 the -- Ms. Courson was the agent, and
6 Ms. Washing was the claims adjustor.
7 Q. So you went down to see them because
8 Mr. Buhlert was not there. Tell me about the
9 conversations you had with them.
10 A. I said, I need some help. And her words to
11 me were, There's nothing -- Ms. Washing said,
12 There's nothing I can do for you, sir. And I
13 said, Well, wait a minute here. I said, Who
14 is my agent; which one of you is the agent?
15 And Ms. Courson said, I am your agent and she
16 handles the adjustments. And I said, Well, I
17 am asking both of you. I'm asking you as my
18 agent, I need some help. The guy didn't show
19 up. We're three weeks from this hurricane.
20 My house is ruined. I have a policy. Is
21 there something you're going to do to help
22 me?
23 She said, Mr. Sanders, What do you want

**Page 40**

1 me to do, write you a check? I said, No,
2 ma'am, I don't want you to write me a check;
3 I want you to get my house fixed. And she
4 said, There's nothing I can do for you,
5 Mr. Sanders. And I said, Fine. She said, I
6 can call Travelers or Standard Fire. I said,
7 I've called Standard Fire; somebody needs to
8 come look at my house.
9 So I left. So that afternoon Mr. Tim
10 Buhlert shows up at my house. And I'll go
11 from there if you --
12 Q. About what time did he show up?
13 A. I'd say he showed up early afternoon.
14 Q. Tell me about the conversation you had when
15 he showed up.
16 A. Okay. Me and my wife and my kids were
17 outside. Mr. Buhlert pulled up and he gets
18 out of the car. We're standing outside and
19 he says, I'm Tim Buhlert. He said, Are you
20 Mr. Sanders? I said, I am. He said, I had
21 phone problems this morning, so I -- I was at
22 the phone -- at the phone company trying
23 to -- the cell phone company trying to get my

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL. 36104
ph: (334) 263-0261; fax 263-1243

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.    7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

11 (Pages 41 to 44)

Page 41

1    phone fixed. And I said, Yeah. And he said,
2    I'm going to tell you why I'm late. I said,
3    All right, why are you late other than that?
4    He said, Because I'm dealing with all these
5    niggers here in Alabama. I said, Do what?
6    And my wife and kids are here. And he says,
7    I'm dealing with these niggers here in
8    Alabama, who are a bunch of savages.
9        And I -- and I said -- I said, Hold on,
10   Mr. Buhlert. I said, My kids are out here.
11   So I sent my kids in the house. And
12   Mr. Buhlert said, I would have been here lots
13   earlier, but I'm dealing -- do you deal with
14   these niggers all the time? I said,
15   Mr. Buhlert, I'm not here to discuss that
16   with you.
17       And he said, I have a -- he said, I have
18   a -- a nigger over here in Montgomery who has
19   a $200,000 home, and she's trying to get
20   everything she can from me, and I'm not
21   going to let her get it. I'm going to fight
22   her. So I've been tied up with her every
23   day. She wants me to buy her bread.

Page 42

1        And I said, Mr. Buhlert, Are you going
2    to look at my -- do you deal with these
3    niggers like this all the time? And I said,
4    Mr. Buhlert, when you come in my house,
5    please don't say that.
6        And we'll go from there when you're
7    ready.
8    Q. Well, what did he do next?
9    A. We went in the house and started --
10   Q. He started the inspection?
11   A. He stayed till approximately six o'clock that
12   evening. And he said, Mr. Sanders, I need to
13   come back Monday and do my second day of
14   inspections. And I said, That's fine.
15   Q. So on the first day, was he there for several
16   hours?
17   A. Yes, sir, he was.
18   Q. Did you walk around with him or --
19   A. Yes, sir, I did
20   Q. And he came back on Monday. Did you take off
21   work Monday?
22   A. Yes, I did.
23   Q. How long was he there Monday?

Page 43

1    A. Most all day.
2    Q. Most --
3    A. Until late afternoon, yes, sir.
4    Q. Mr. Sanders, were you satisfied that as to --
5        aside from all the other things you testified
6        about Mr. Buhlert -- in terms of the
7        thoroughness of his inspection on that day --
8        on those two days?
9    A. Say again, now?
10   Q. Were you satisfied with the thoroughness of
11       his inspection on the Friday and the Monday?
12       Did he look at everything you wanted him to
13       look at?
14   A. Yes, he did.
15   Q. I could have asked that a whole lot better.
16   A. Well, I --
17   Q. I got to it eventually.
18   A. Yes, he did. He did.
19   Q. Did he give you any -- did he ever tell you
20       what you could expect from the claim from
21       that point going forward?
22   A. Yes, sir, he did.
23   Q. What did he tell you?

Page 44

1    A. He told me that -- and I asked him. I said,
2    Can you give me an approximate of what I'm
3    going to get? He said, Yes, sir, I don't
4    normally do this, but I will. He said,
5    you're going to get approximately $30,000.
6    He said, Is that sufficient? I said, Yes,
7    sir, that is sufficient. And he said, You
8    will have it by Halloween.
9        And then I want to say something else,
10   if I may, about Mr. Buhlert and his language.
11   Q. Sure.
12   A. To this day, my kids -- and, you know, I try
13   to bring my kids up right or what I feel is
14   right. Everybody's different, and obviously
15   as Mr. Buhlert is different. But, you know,
16   to this day I discipline my kids and try to
17   raise them how I feel like they should be
18   raised, and I still have to discipline my --
19   my -- especially my son for saying that word,
20   all from Mr. Buhlert being at my house. And
21   my son's question to me the last time he
22   brought this up was, Daddy, what is a savage
23   nigger? So that's what my son got from

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.    7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

12 (Pages 45 to 48)

Page 45

1    Mr. Buhlert being at my residence. And I
2    wanted to point that out.
3    Q. Okay. Did he show you -- when he gave you
4    this $30,000 figure, this was orally?
5    A. Uh-huh.
6    Q. Did he show you any worksheets or anything as
7    to how it was being calculated and what you
8    were getting for what?
9    A. Yes, sir, he did.
10   Q. Did he go over it with you in some detail?
11   A. He didn't go over in any detail. He showed
12   me -- he took notes for two days and got his
13   computer program out. He had his laptop with
14   him, and for two days he done his -- he done
15   his calculations and he done his
16   measurements. And on the Monday evening
17   before he left, he had a legal pad like you
18   have there. And he went over it and had
19   numerous pages and showed me. He said, I
20   will give you an exact -- I cannot give you
21   an exact dollar figure to the penny, but he
22   said it's approximately 30,000.
23   Q. Okay.

Page 46

1    A. And he says, Is that sufficient? And I said,
2    Yeah, that's sufficient.
3    Q. Okay.
4    A. And you will have your check by Halloween.
5    He said, And, Mr. Sanders, you can go ahead
6    and have your house fixed now. I said, No,
7    sir, I can't have it fixed until I get the
8    money. He said, Well, you'll have it by
9    Halloween.
10   Q. All right. Did you talk to Mr. Buhlert about
11   any concern you had over mold at that point?
12   A. Mr. Buhlert -- Mr. Buhlert brought it up to
13   me about the mold.
14   Q. Okay.
15   A. He told me that he had been in this business
16   a long time; and he said, Mr. Sanders, the
17   problem you're going to have here in your
18   residence is what's growing behind these
19   walls. He said, your attic is so wet and has
20   leaked down into these walls; he says, you're
21   going to have a mold problem. He said, it
22   may not show itself for months, maybe even a
23   year or two, he said, but you're going to

Page 47

1    have mold in your home.
2        And he said, Do you have -- does any of
3    your children have any kind of allergies?
4    And I said, Yes, my son has bad allergies.
5    And he said, Well, we're going to need to get
6    this fixed because you are going to have a
7    mold problem. And that's when he got on the
8    phone that day and called Mr. Chuck Brown
9    from ICA and -- and right there in front of
10   me told Mr. Brown that he felt like the
11   Sanders' home needed mold remediation. And
12   Mr. Brown, according to Mr. Buhlert, told
13   him, if you don't see any mold, we're not
14   doing any remediation.
15   Q. Did Mr. Buhlert relate to you whether he saw
16   any mold in your house?
17   A. I cannot say he said he saw any. He just
18   said you can expect it.
19   Q. Now, you told me about a carpet person that
20   Mr. Buhlert called out.
21   A. Uh-huh.
22   Q. Did he call anybody else out during his
23   inspection to come look at anything?

Page 48

1    A. No.
2    Q. Did I ask you that carpet person's name?
3    A. You didn't, but I don't know.
4    Q. Okay. These figures that you looked at from
5    Mr. Buhlert, were they on his computer or
6    were they sheets of paper?
7    A. He actually had them on both. He was taking
8    it from his legal pad and putting it on his
9    computer, because he was punching -- he would
10   say, you get so much -- this cost this to
11   replace and this cost this.
12   Q. Do you have any recollection as you sit here
13   today, as to the specific areas of the house,
14   what Mr. Buhlert represented to you, you
15   would be paid for? Does that make any
16   sense?
17   A. No, sir.
18   Q. That may have been a bad question. You told
19   me you looked at sheets I am assuming are
20   worksheets, like what I call worksheets.
21   A. Uh-huh.
22   Q. And usually the worksheets that I have seen
23   are broken down room by room.

Page 49

1   A. Uh-huh.
2   Q. Certain items that they're going to pay for
3      and certain rooms -- telling what you're
4      going to do per room.
5   A. Uh-huh.
6   Q. Is that --
7   A. I understand.
8   Q. And what I'm asking is if you have any
9      recollection by room what Mr. Buhlert's
10     figures said you were going to get.
11  A. I can only tell you what Mr. Buhlert --
12     Buhlert told me they were going to fix in my
13     whole house.
14  Q. That would be good.
15  A. Is that what you want to know?
16  Q. Yes, sir. That would be great.
17  A. He said the whole interior of the house would
18     be painted. He said the insulation would be
19     taken out, replaced. The roof -- a new roof
20     would be put on. New hardwood floors would
21     be put down. All -- like I say, all
22     painting, interior painting, all the carpets
23     replaced, surround sound replaced, computer

Page 50

1      fixed, tables -- kitchen tables replaced,
2      chairs replaced, bar stools replaced, all
3      carpet, all furniture --
4   Q. Hang on. I'm writing as fast as I can. I
5      got carpets replaced, surround sound, kitchen
6      tables. Bar stools?
7   A. Bar stools.
8   Q. Okay. Keep going. You're just going to have
9      to go a little slower.
10  A. Okay. All furniture cleaned.
11  Q. Okay.
12  A. Work had to have been done on some cabinets
13     that were collapsing due to the water.
14  Q. Okay.
15  A. Like I say, several pieces of ceiling, the
16     sheetrock --
17  Q. Yes, sir.
18  A. -- cut out and replaced. The bed -- my
19     child's beds replaced.
20  Q. Are those the -- are those bunk beds?
21  A. Yes, sir.
22  Q. In your son's room?
23  A. And daughter.

Page 51

1   Q. And daughter?
2   A. Uh-huh. All the stuff that we lost in the
3      attic would be replaced, all the clothes.
4      All the food we lost would be replaced. All
5      the blinds, the blinds in the house would be
6      replaced, all of them but about three. And
7      he said since they were all in an open room,
8      the living room and dining room, that these
9      would be replaced also along with all of the
10     rest of them in the house that were actually
11     water damaged. He said all that would be
12     replaced.
13  Q. Those are wooden blinds?
14  A. Yes, sir.
15  Q. All right.
16  A. The foyer would be replaced.
17  Q. When you say the foyer, you mean the floor?
18  A. Uh-huh.
19  Q. I've got a pretty good list, I think.
20  A. And that may not be all.
21  Q. I understand.
22  A. That's just all I can think of right now.
23  Q. That's all I want to know is your

Page 52

1      recollection.
2   A. Oh, and I can tell you another. The -- the
3      storage shed roof replaced, the gate of my
4      fence replaced, and sections of my fence
5      replaced.
6   Q. Mr. Sanders --
7   A. Yes, sir.
8   Q. -- when he gave you this estimate, he said
9      $30,000; and you said that seems about right
10     to me?
11  A. Yes, sir.
12  Q. Are you going on your own experience, or did
13     you have somebody come in and tell you how
14     much it was going to be to fix your house?
15  A. No. I was going on what he told me that I
16     took in good faith was the standard
17     replacement cost. Because he had a program,
18     computer program, that he showed me; and he
19     said, Mr. Sanders, this is what it cost to
20     replace these items. He actually showed me.
21     So I took him at his word that he was there
22     to help me and guide me in this. So I had no
23     reason not -- not to believe him.

Page 53

1 Q. Yes, sir. I understand. I just wanted to
2   make sure that it was your understanding of
3   what it would take and not somebody you had
4   asked to come in and look at it.
5 A. No, sir. No, sir.
6 Q. So Mr. Buhlert leaves on a Monday?
7 A. Yes, sir, he does.
8 Q. Tells you to expect your check by Halloween?
9 A. Yes, sir.
10 Q. What is the next thing that happens?
11 A. Oh, about a week or 10 days later, I get a
12   call from Mr. Buhlert one evening when I come
13   in.
14 Q. Tell me about that conversation.
15 A. Mr. Buhlert says, Mr. Sanders, this is Tim
16   Buhlert. And he said, I just wanted to let
17   you know that I've been fired from my job.
18   And he says, The payment -- you will not be
19   receiving a payment as promised. He said,
20   They will -- Standard Fire will set you up
21   another adjustor and that -- he said,
22   Mr. Sanders, I want you to know something. I
23   said okay.

Page 54

1        He said, You remember when you went to
2   the Alabama Insurance Commissioner's Office
3   and complained a couple of times on Standard
4   Fire and ICA? I said, Yes, sir. He said,
5   Chuck Brown told me that yours would be the
6   last damn house fixed in the state of
7   Alabama; being you wanted to complain, we'll
8   give you something to complain about.
9        I said, Thank you, Mr. Buhlert. And I
10   said, Well, why are you calling me? He said,
11   Because they -- they done me wrong. I tried
12   to do them a good job, and they didn't like
13   what I was turning in, and they fired me.
14 Q. And Mr. Buhlert, in that conversation, was
15   referencing conversations you had with the
16   State Department of Insurance prior to this
17   time?
18 A. Uh-huh.
19        MR. SANSPREE: Answer --
20 Q. Out loud.
21 A. Yes. Yes.
22 Q. Tell me about those conversations.
23 A. With?

Page 55

1 Q. The State Department of Insurance. When was
2   the first time you talked to them?
3 A. I believe the first time I went to the
4   Department of Insurance was the next morning
5   following this conversation right here with
6   Mr. Buhlert.
7 Q. All right. So in this conversation with him,
8   as I understood what you told me, that Chuck
9   Brown made these remarks in response to the
10   fact that you had gone to the commissioner's
11   office.
12 A. Yes, sir.
13 Q. And you had not been to the commissioner's
14   office before this time?
15 A. No. That I complained. And then,
16   subsequently, I went to the commissioner's
17   office, but --
18 Q. Okay. Let's -- let's --
19 A. Okay. I'm sorry. I'm sorry. I got ahead of
20   myself.
21 Q. No. I got a little confused. You were
22   complaining to Standard Fire?
23 A. Right.

Page 56

1 Q. And to your agent?
2 A. And to ICA.
3 Q. And to ICA?
4 A. Right.
5 Q. Who at ICA did you talk with?
6 A. Chuck Brown.
7 Q. You talked with Chuck Brown personally?
8 A. Yes. Several times.
9 Q. All right. When did you first talk to Chuck
10   Brown in this whole process?
11 A. The first time I believe I talked to Chuck
12   Brown was the day that Tim Buhlert didn't
13   show up at his assigned time.
14 Q. The same day you went to the agent's office?
15 A. Yes.
16 Q. And what did Chuck Brown tell you?
17 A. He told me that he would get it handled.
18 Q. Okay.
19 A. That Mr. Buhlert would be there, he would get
20   him out there. And I apologize because I
21   misspoke earlier about when I went --
22 Q. That's all right. I don't think you
23   misspoke. I was just confused, and we

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.                    7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

15 (Pages 57 to 60)

Page 57

1    just --
2    A.  I -- I was confused as to what -- the
3       events.  And I'm sorry.  I apologize for
4       that.
5    Q.  That's all right.  We'll get it straightened
6       out.
7    A.  Okay.
8    Q.  So you talked to Chuck Brown that day?
9    A.  Right.
10   Q.  He said he would get it handled?
11   A.  Right.
12   Q.  Mr. Buhlert is out that afternoon.  When was
13      the next time you talked with Chuck Brown?
14   A.  The next time I talked to Chuck Brown was the
15      next day after Tim Buhlert got fired.
16   Q.  So this day, this next day, you talked
17      with -- you think you talked with the
18      commissioner's office?
19   A.  Hold on.  Let me get it straight.  The next
20      day after he got fired and I wasn't going to
21      get any money, I went to Pinckard Agency and
22      complained with them again.  When I left
23      there, I went to the Alabama Insurance

Page 58

1       Commission's Office.
2    Q.  Okay.
3    A.  And what I -- and what I meant to say -- and
4       I apologize -- is when -- initially when I
5       complained, it was complaining to Standard
6       Fire and to Pinckard Agency is what he was
7       referencing that I went in to make a
8       complaint to.
9    Q.  I understand.  I understand that.
10   A.  Okay.  And then I went to the Alabama
11      Insurance Commissioner's Office and told him
12      what happened.  So he called Standard Fire
13      and got them and ICA on the three-way.  And
14      he says, Mr. Sanders is here making a
15      complaint.  He says, Mr. Sanders informed us
16      that Tim Buhlert got fired, and we want to
17      know -- and the insurance commissioner said
18      we want a copy of his worksheet,
19      Mr. Buhlert's worksheet.
20          And they said, Well, we can't -- we
21      don't have it.  And he said, You don't have
22      it?  And they said, That's right, we don't
23      have it.  And he said Well, what did you do

Page 59

1    with it?  And they said, We'll have to get
2    back with you on that.  They said, But
3    somebody will be at your house Monday -- a
4    Mike Davis will be at your house,
5    Mr. Sanders, Monday.
6    Q.  Now, who was the person at the Insurance
7       Department?
8    A.  Ken Williamson.
9    Q.  Ken Williamson?
10   A.  Uh-huh.
11   Q.  Now, Mr. Williamson got on this three-way
12      phone call with -- do you know who he was
13      talking to at ICA?
14   A.  Jean Harper.
15   Q.  Jean Harper?
16   A.  Yes, sir.
17   Q.  Do you know who he was talking to at Standard
18      Fire?
19   A.  Chuck Brown.  Oh, I'm sorry.  No.  Jean
20      Harper doesn't work for --
21   Q.  At Standard?  That's --
22   A.  That's Travelers.
23   Q.  Okay.  And Chuck Brown at ICA?

Page 60

1    A.  That's right.
2    Q.  Were they on speaker?
3    A.  Yes.  And I'll tell you what they said when
4       you get ready.
5    Q.  You go ahead.  I'm writing.
6    A.  Mr. Williamson asked what I told you
7       previously about we want a copy of the
8       worksheet, dah-dah-dah.  Jean Harper said,
9       Mr. Williamson, I can promise you that there
10      will be a new adjustor at the Sanders' house
11      Monday morning; his claim will be finished
12      Monday evening.  And she said, Do you hear
13      me, Mr. Brown?  He said, Yes, ma'am, I do
14      hear you.  She said, I want him out there at
15      the Sanders' house at eight o'clock Monday
16      morning and I want it sitting on my desk
17      completed Monday afternoon.  He said, Yes,
18      ma'am, that will happen.
19          And then Mr. Brown said, Mr. Sanders,
20      we're going to get it taken care of.  Mike
21      Davis will be the gentleman coming to your
22      house Monday morning at eight o'clock.
23   Q.  How did you get to Mr. Williamson?  Did you

Page 61

1    know Mr. Williamson?
2  A.  No. I went straight to the Insurance
3      Commissioner's Office and told them I had a
4      problem and I needed some help. And they
5      told me to come right in.
6  Q.  All right. So was this on -- since he was
7      going to be there on a Monday morning I'm
8      assuming this was a Friday.
9  A.  Yes, sir.
10  Q.  I'm making that assumption.
11  A.  Yes, sir.
12  Q.  So does Mr. Davis show up Monday morning?
13  A.  He did.
14  Q.  Eight o'clock --
15  A.  He did.
16  Q.  -- or around there?
17  A.  Around eight o'clock.
18  Q.  And you were off work that day?
19  A.  I took -- I wasn't off, but I took off.
20  Q.  And tell me about conversations with
21      Mr. Davis.
22  A.  Okay. Can we take a break for a second
23      before I get into that?

Page 62

1  Q.  Sure. Absolutely. Absolutely. And I meant
2      to tell you that. If you need to take a
3      break anytime --
4  A.  Yes.
5          (Brief recess)
6  Q.  We're back to Mr. Davis.
7  A.  Yes, sir.
8  Q.  Eight o'clock Monday morning.
9  A.  Yes, sir.
10  Q.  Tell me what happened.
11  A.  Okay. Mr. Davis pulled up. I saw him get
12      out of his truck. He came to the door, to
13      the back door, side door; and I opened -- I
14      had the -- the main door open. And I opened
15      up the glass door; and I said, How are you
16      doing, my name is Phil Sanders. And he
17      stepped in up to me, wouldn't shake my hand.
18      I looked at him. He said, You need to show
19      me what's wrong.
20          I mean, I looked at my wife, whatever,
21      and turned around. And I said, Well, do you
22      want to start in here in this room here since
23      we're right here? He said, You start

Page 63

1      anywhere you want; show me what's wrong. So
2      I knew what kind of day we was fixing to have
3      then.
4          I said, As you can see, I said, on the
5      ceiling up there, you can see -- I said, of
6      course it's dry now, but where the water had
7      leaked in. And he said -- he said, you can
8      accuse me of being blind this morning, he
9      said, but I don't see shit. And I said, Hold
10      on, Mr. Davis. I said, My wife is in here.
11      I said, You're not going to talk like that in
12      my house; I said, I can tell you that right
13      now. And he looked at me. And I said, Now,
14      do you want me to go forward?
15          So I started telling him what was wrong
16      with each room. And he had a little camera
17      in his hand; and when I would show him like
18      where the windows was cracked and rotten from
19      the water, he would look at me and smirk and
20      raise his camera up and take a picture and
21      then look at me: Next? So he was very
22      obnoxious. He was rude. He tried to
23      intimidate me. He was as big as the house,

Page 64

1      as you'll see when you see him, how big he
2      is. So, obviously, I see he was there to
3      intimidate me, I guess were his intentions.
4          And, you know, so anyway we started
5      going from room to room. It went very
6      quickly. I said, do you want me to point it
7      out, I said, like when me and Mr. Buhlert
8      done this? He said, Let me tell you
9      something, he said, Mr. Buhlert has caused
10      me a lot of problems; I don't care about
11      Mr. Buhlert; show me what's wrong with your
12      house; I'm working the case, not Mr. Buhlert.
13          So like I say, it was very tense in the
14      house. He obviously wasn't there with his
15      best interests. He was there to teach me a
16      lesson, I assume, show me who was in charge.
17      Because, see, just like this -- and I didn't
18      say this while ago. The next day after
19      Mr. Buhlert got fired and I called Chuck
20      Brown, there was a phone message left on my
21      answering machine from Mr. Buhlert. And it
22      said, Mr. Sanders, this is Tim Buhlert. He
23      said, Please don't make no more calls on my

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 36104
ph: (334) 263-0261; fax 263-1243

Page 65

1  behalf, he said, because if you do, I'm going
2  to jail. And he left that on my answering
3  machine. I'm sure you've heard that, that
4  conversation.
5      And then like I say, that next day or
6  when I talked to Mr. Buh -- Mr. Chuck Brown,
7  he also said, Mr. Sanders, he said, I
8  don't -- he said, Ms. Washing and Ms. Courson
9  have informed me that you're trying to commit
10  a fraud. And I said, Do what? He said,
11  You're -- they informed me that you're trying
12  to submit a fraudulent claim. And I -- you
13  know, I said, Well, that's your opinion;
14  that's their opinion.
15      So just to let you know, that's -- and
16  that's why I figure they sent this big old
17  fellow down to -- to Montgomery out of Ohio I
18  guess to teach me a lesson and intimidate me
19  in my house. And the whole way through our
20  house, when I would show stuff to him, he
21  would stick his camera in there and do that
22  smirk at me and try to get close up to me.
23  And -- and it was -- it was just an

Page 66

1  afternoon -- or not an afternoon. He didn't
2  stay that long. It went real quick. And I
3  told him, I said, do you want me to pull up
4  the carpet and show you where it's
5  delaminated? You can see it. No, I don't
6  need to look at your carpet. I said, Fine.
7      We got up -- went up to the attic. I
8  pulled the attic down and stepped up in there
9  and got up in the attic. And I said, I'll
10  show you. Be careful when you walk up here
11  because -- you know. He stuck his camera up
12  there with -- again with that smirk, and
13  looked at me and snapped several pictures off
14  and got down out of the attic.
15      And like I say, he obviously was not
16  there to help me. He was there to hurt me,
17  show me who was boss, and not interested in
18  giving me what was due me through my policy.
19  And I know that. And that's why we're here,
20  I guess.
21  Q. Okay. So he never pulled up any carpet?
22  A. None.
23  Q. Did you show him this -- I call it a utility

Page 67

1      closet.
2  A. Yes, sir. Air handler room.
3  Q. Did you show him in there?
4  A. Yes, sir. And also I want to say this. When
5  I showed him the air handler room -- because
6  the air handler room was just awful damp
7  because that's where the -- even when he got
8  there that room was -- was still wet. So he
9  walked outside to get a piece of equipment.
10  I don't know how long he's been in the
11  business. I feel like he's -- his job is the
12  enforcer, and that's what his job is. No
13  doubt in my mind why he's sent to a house,
14  not because he's a good adjustor.
15      He goes out, he brings back a piece of
16  equipment. He said, Yeah. He said, You see
17  this -- and, of course, he talked to me like
18  I was an Alabama hick, like I'm some idiot.
19  And that's his whole thing. And he showed
20  me, he said, You see this machine here? He
21  said, This right here tells you how damp a
22  piece of wood is. He said, People don't know
23  when they file fraudulent claims -- didn't

Page 68

1  accuse me of filing one, mind you. He said,
2  People don't know when they file fraudulent
3  claims, when they wet something, they don't
4  think about that, you know, the wet -- that
5  the wood has got to be saturated with water;
6  that way it registers being wet.
7      So he turned around with his smirk and
8  looked at me and stuck the little prong in
9  the wood and left it there for 30 seconds or
10  so and pulled it up and turned it. He said,
11  This reading from zero to some odd number
12  would mean it's fairly damp, and he went down
13  the scale. He says, What does it say,
14  Mr. Sanders? And I said, It doesn't say
15  anything, sir. So then he figured out it
16  didn't have a battery in it, so he went and
17  put that up.
18      You know, that's the kind of afternoon I
19  had. Okay?
20  Q. Yes, sir.
21  A. With the enforcer in my house. And, of
22  course, later to find out he assaulted my
23  wife. We'll get to that. You know, not only

Page 69

1   did he come to intimidate us, he physically
2   put his hands on my wife. And, you know,
3   that's neither here nor there, because
4   obviously I wasn't there.
5   Q. Okay.
6   A. But --
7   Q. Now, I just want to get the time frame
8   straight. He got there about eight o'clock.
9   How long did he stay?
10  A. I'd say he was -- I left before he left
11  because I had to go back to work; but he was
12  probably there an hour, a little over an hour
13  while I was there. And I don't know how long
14  he stayed after I left, but you can ask my
15  wife.
16  Q. I'll ask her that. Did he ever put a battery
17  back in his moisture reader?
18  A. No.
19  Q. And when you say that that room was wet, what
20  kind of floor does that room have or did it
21  have that day?
22  A. It has a -- like a particle board floor.
23  Q. And that was wet that day?

Page 70

1   A. Yes, sir.
2   Q. At any point up to this day -- this is off
3   the -- I'll get back to where we went
4   going -- had you seen anything that you would
5   consider to be mold or mildew growth in your
6   home?
7   A. I -- I did see a couple of things; and not
8   being familiar with mold or mildew, I didn't
9   know what I was looking at. I noticed we had
10  a bad odor in the house. And, of course, I
11  attributed that to just being the carpet and
12  the whole thing. And, of course, as I found
13  out later from Mr. Mike Riggs, when he
14  pointed out mold growing, that's what we were
15  smelling more so than the carpet, in his
16  opinion. And yes, because after we found the
17  mold growing in the attic, I have been
18  cleaning today. To this day, I still have to.
19  Q. Did you ever see anything -- I've got the
20  odor down. Did you ever see anything on the
21  walls, black stuff on the walls, any
22  discoloration other than the water stains,
23  that you would, in your mind -- I'm not

Page 71

1   asking you -- I know you -- I'm not asking
2   you to say more than you know -- but in your
3   opinion could have been mold or could have
4   been mildew or something was different?
5   A. You know, I just -- like I say, I don't think
6   I knew enough about it to --
7   Q. That's fair enough. So his inspection of the
8   downstairs, you've already described that to
9   me. And then you've described he did not
10  ever go -- take his -- physically walk up
11  into the attic?
12  A. He stepped up to the top -- to the top step
13  of the stairs and put his camera there and
14  don't let me forget, looking at me, smirking
15  the whole time, trying to intimidate me I
16  guess is what his game was, and snapped
17  several pictures around and then got out.
18  Q. So he never physically walked up into the
19  attic?
20  A. No.
21  Q. Were you there when he inspected your roof?
22  A. No. I was gone.
23  Q. Did he talk to you about any of the

Page 72

1   furniture?
2   A. He wouldn't talk to me about anything, sir.
3   I tried to talk to him about the furniture,
4   and he done his classic little smirk and kept
5   moving.
6   Q. Okay. And this is what I wanted to
7   understand. And you described with
8   Mr. Buhlert, you and Mr. Buhlert going
9   through the house and him discussing this
10  specific item, this specific item. Mr. Davis
11  did not discuss anything with you --
12  A. No, sir.
13  Q. -- other than the conversation?
14  A. He would not talk to me and made it very
15  clear to me on more than one occasion that
16  this was his case.
17  Q. So you went back to work in about an hour,
18  hour and a half. What was the next thing
19  that happened on the claim?
20  A. The next thing I remember is -- okay. Well,
21  that night I called Ms. Jean Harper and --
22  because the -- as the agreement was from the
23  Alabama Department of Insurance office, it

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 36104
ph: (334) 263-0261; fax 263-1243

Page 73

1    would be done Monday afternoon, completed.
2    And it wasn't. Ms. Harper was nowhere to be
3    found. I was told she was off. So then they
4    put me to a Mr. Greg Fryer and to a Mr. -- I
5    think it was Brian Coffin. I talked to them
6    over several days, and they told me plenty of
7    untruths theirself and would not call me
8    back.
9        So I called Mr. Brown, Chuck Brown,
10   again. And I said, Mr. Brown, this is Phil
11   Sanders and y'all agreed that my claim would
12   be done today; can I check on the status of
13   that? He said, Let me tell you something,
14   mister. He said, Your claim ain't going to
15   be done today; it will be a week or two. I
16   said, Well, you know, we made the agreement.
17   He says, We got the case; don't tell us how
18   to do our work. He said, Because all you're
19   doing is filing a fraudulent case. I know
20   what you're doing, Mr. Sanders. I said, you
21   know, fine.
22   Q. All right. Back up just a minute. So after
23   **Mr. Davis came out and the conversation, you**

Page 74

1    tried to call Jean Harper?
2    A. Uh-huh.
3    Q. Jean was gone?
4    A. Uh-huh.
5        MR. SANSPREE: Try to answer out.
6    A. Yes.
7    Q. You talked to Mr. Fryer and Mr. Coffin?
8    A. His last -- I talked to a Mr. Greg Fryer, and
9        I believe his name was Brian Coffin.
10   Q. And you told me that you talked with them
11   over a period of several days?
12   A. Yes, sir.
13   Q. And you said that they told you some things
14   that were untrue?
15   A. Yes, sir.
16   Q. Tell me what those were.
17   A. Well, the first thing was, We'll call you
18   back in a few minutes, Mr. Sanders. And they
19   wouldn't call me back. I hope you've got the
20   toll records to show how many phone calls
21   they made to my house because that backs me
22   up better than anything. So they lied to me
23   in that sense, that it would be taken care

Page 75

1    of; and it never was. And then all of a
2    sudden, I get a check, you know, for two
3    thousand and something dollars. And I'm mad
4    and I'm upset and I know that I've been done
5    an injustice; that, you know, I was taught a
6    lesson. And Standard Fire was allowing this
7    to go on because I made it clear the
8    allegations of what Mr. Brown said about me.
9    I made it very clear of that. And, you know,
10   they chose to handle it the way they chose to
11   handle it.
12   Q. Okay. Let me stop you just a second. I want
13   to get these conversations in order.
14   A. Okay.
15   Q. And the conversations with Mr. Coffin and
16   Mr. Fryer, you told me the untruths were they
17   wouldn't return your phone calls.
18   A. That's correct.
19   Q. Did they ever call you back? These -- let me
20   narrow it down. These initial calls that you
21   made to them, you made -- I'm understanding
22   you made separate calls to them.
23   A. I made separate calls to that office. And

Page 76

1    occasionally they would put him on the phone,
2    and occasionally they would put the other on
3    the phone.
4    Q. And how many -- if you can remember, how many
5    did you make to them right after Mr. Davis
6    came out in, say, the one or two days right
7    after?
8    A. Over ten.
9    Q. And did you -- how many times did you talk
10   with them personally on -- not a voice mail?
11   A. Several.
12   Q. And they told you each time they would get
13   back to you?
14   A. Yes, sir.
15   Q. And they never did?
16   A. And they never did.
17   Q. And aside from that, is there anything else
18   they told you that you're contending was
19   untrue?
20   A. Well, I asked -- after I got the check, I
21   asked Mr. Coffin would he send me a copy of
22   my -- of this file where I could see. And he
23   refused.

Page 77

1    Q. Okay. And we'll get to that.
2    A. Okay.
3    Q. I'm just talking about these conversations
4       right after.
5    A. Oh. Oh, oh. At no time -- he told me this,
6       Brian Coffin. I said, Mr. Coffin, I'm
7       sitting here right now -- and it was raining
8       that night, and my house was still leaking.
9       And my son was in there broke out from head
10      to toe with what the doctor later said was a
11      result of that mold, couldn't breathe. And I
12      said, Mr. Coffin, I'm sitting in this house
13      that's still leaking with your check for two
14      thousand something dollars to fix my house.
15      And I said, My son can't even breathe in
16      there. Well, then, you need to do what you
17      need to do, don't you? I said, Yes, sir, I
18      guess I do.
19   Q. And that took place -- that was after you got
20      the check? That was -- let's do this. When
21      did you get the check for the $2800 after
22      Mr. Davis came out? How long was it? Do you
23      remember?

Page 78

1    A. A week or 10 days, as best I recall. It was
2       a while. It wasn't Monday.
3    Q. Okay. So these couple of days after
4       Mr. Davis came out on a Monday, you had
5       conversations with Greg Fryer and Brian
6       Coffin and they would not return your phone
7       calls?
8    A. Nor Jean Harper.
9    Q. Nor Jean Harper.
10   A. Uh-huh.
11   Q. And you also -- and aside from them saying
12      I'll call you back and not doing it, is there
13      anything else they told you that was untrue
14      in those conversations?
15   A. Sure.
16   Q. What did they tell you?
17   A. Both of them told me that, Mr. Sanders, we
18      will see that your claim is handled properly
19      and you are done or given what's due you
20      under your contract. And that was an
21      untruth, because they did not. And at no
22      time did they offer me anything such as --
23      you know, at the time, I didn't know that I

Page 79

1       might be due under my contract to be able to
2       stay in a motel. My house was unlivable.
3       They made no -- they made no offer to help me
4       and lied to me in the sense that they said we
5       will make sure it is handled properly. And
6       they didn't.
7    Q. On another topic, did you ever receive a copy
8       of your policy?
9    A. I never got a copy of my policy.
10   Q. Did you ever receive anything telling you
11      what kind of coverages you have?
12   A. The only thing I ever received from Standard
13      Fire was a dec sheet.
14   Q. Did you ever ask your agent why you didn't
15      get a copy of the policy?
16   A. No.
17   Q. So we talked about the conversations in this
18      two- or three-day period right after
19      Mr. Davis came with the Standard Fire folks
20      with Fryer and Coffin. And you also said
21      that you called -- well, let me ask you
22      this. After you talked with them during this
23      period of time, did you talk with anybody

Page 80

1       else?
2          That's a bad question. Let's go back
3       and start all over. You said you talked to
4       Chuck Brown?
5    A. Yes, sir.
6    Q. And this was one or two weeks after Mr. Davis
7       came out. And he had told you -- no. This
8       was when he told you you would get your check
9       in one or two weeks?
10   A. No, no, no.
11   Q. Okay.
12   A. Who told me I would get a check?
13   Q. Chuck Brown. Your claim would get handled in
14      one or two weeks.
15   A. No, sir. My claim would be handled --
16      finished Monday evening after he -- oh, and
17      then when he told me, yeah, he said it would
18      be a week or two. You're right.
19   Q. After Mr. Davis.
20   A. Absolutely.
21   Q. So in that conversation with Chuck Brown, did
22      he say anything else to you?
23   A. Well, actually, his brother got on the phone

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 36104
ph: (334) 263-0261; fax 263-1243

Page 81

1    during one of those times, a Mr. Troy Brown.
2    Q. Okay.
3    A. And Mr. Troy Brown said, Mr. Sanders, there
4    again, I think you're filing a fraudulent
5    claim and so you can stop the bullshit, you
6    know, was his words to me. And I -- and I
7    come to find out, I believe he may be the
8    president of the company. I don't know.
9    Q. All right. So Chuck Brown told you were
10   filing a fraudulent claim?
11   A. Uh-huh.
12   Q. Troy Brown told you you were trying to file a
13   fraudulent claim? Do you remember when you
14   talked to Troy in relation to all this?
15   A. I do. Troy --
16   Q. When was that?
17   A. I talked to Troy after I got the check. And
18   it was the next day, like a Saturday. And he
19   happened to be there at the office. Of
20   course, as I have found out in the past,
21   it's -- obviously, it must be like a
22   two-dollar company, because sometimes they
23   answer and sometimes they don't. So he -- he

Page 82

1    got on the phone and was very rude and
2    belligerent and, you know, let me know what
3    he thought about me and he was not there to
4    help me.
5    Q. Okay. So you talked with Chuck right after
6    Mr. Davis came out?
7    A. I talked to Chuck several times during that
8    week. I mean, a couple of times a
9    day. You know, numerous times did I call
10   that number and talk to Mr. Chuck Brown.
11   Q. And then you got a check?
12   A. Yes, sir.
13   Q. In the amount of around $2800, something like
14   that?
15   A. Yes, sir.
16   Q. And that resulted — you called somebody
17   about that?
18   A. I called them all.
19   Q. You called -- first let's start with the
20   Standard Fire folks first.
21   A. Absolutely.
22   Q. You called Mr. Fryer, Mr. Coffin, and
23   Ms. Harper?

Page 83

1    A. I called. Of course, I only spoke with one
2    of them.
3    Q. Do you remember who you called?
4    A. If I had to say, I would say it was
5    Mr. Fryer.
6    Q. Tell me about that conversation.
7    A. He said, You know, Mr. Sanders, he said, I
8    don't understand what's going on here. He
9    said, But I do know, he said, after talking
10   with you and all that we've been through the
11   last few weeks and, he said, you telling me
12   the kind of damage that your house sustained
13   and, he said, then when I got this report --
14   when I finally got this report, he said, I
15   was in shock, he said, because there is such
16   a discrepancy in the two claims. Something
17   ain't right. And I said, Yes, sir, and are
18   you going to do something about it? And he
19   said, There's nothing I can do. I said,
20   Fine. I said, Can I have everything in my
21   file sent to me?
22       And then he sent me a letter saying --
23   he sent me a few things, pictures. And then

Page 84

1    he sent me a letter saying that until he got
2    approval by local management, he would not
3    send me anything, which I believe is a
4    violation of their contract; but be that as
5    it may.
6    Q. So this conversation with Mr. Fryer, was this
7    the same conversation you were talking about
8    when it was raining?
9    A. No. Because that was at night when I talked
10   to him. That was in the evening.
11   Q. Do you know if that was before this one?
12   A. That was before that right there because that
13   was about the last one right there.
14   Q. When you talked to him that night saying it's
15   raining, we still got a problem and --
16   A. And my son can't breathe.
17   Q. Son can't breathe -- did he have the file?
18   Did he have the estimates from Mike Davis?
19   Do you know? Did he reference those in the
20   conversation?
21   A. Oh, he had them by then, yes, sir. I -- I
22   think. Let me preface that by I believe he
23   did.

Page 85

1   Q. Let me ask it this way. Do you remember
2      talking to him about it, about those specific
3      estimates --
4   A. Oh, sure.
5   Q. -- in that conversation?
6   A. Well, I can't say which conversation, but I
7      recall him saying about the discrepancy.
8   Q. But I understand that was yet another
9      conversation that took place a little later.
10  A. And it may have been.
11  Q. Okay. That's fair enough. Now, once you got
12     the check, you said you called everybody.
13     Did you call Troy or Chuck? Is that when you
14     got Troy on the phone?
15  A. I think that's when Troy got on the phone.
16  Q. And after this conversation with Troy, did
17     you talk to anybody else at ICA?
18  A. I don't believe so.
19  Q. Did you call the State Department of
20     Insurance?
21  A. I went down there.
22  Q. When did you go down there? Was it the next
23     week? Because you said you talked to Troy on

Page 86

1      a Saturday.
2   A. I don't recall when I went, but it was after
3      that, and it wasn't on a -- obviously it was
4      during the week that I went down there, but
5      yes, I went down there again.
6   Q. All right. And you went to see
7      Mr. Williamson again?
8   A. Yes, I did.
9   Q. Tell me what happened then.
10  A. I showed him the pictures of my son, told him
11     what had happened, told him, you know, how
12     they said they were coming, you know, that
13     Monday and they didn't and all that. And he
14     indicated to me that that was wrong and that
15     he was prepared to check into it and didn't
16     know if he could do me any good, but he was
17     certainly going to try.
18  Q. Okay. Did he take any action while you were
19     in his office on that day, or was it later?
20  A. I don't recall him doing the action while I
21     was there in front of him. He called me back
22     a few days later.
23  Q. What did he say then?

Page 87

1   A. He said, I talked to whoever. And I said,
2      Mr. Williamson, I've been informed by my
3      attorney to let you know that we filed suit.
4      He said, Fair enough. He said, I wish you
5      good luck. And he said, Now that you've
6      filed suit, I have to close this out. If
7      y'all need me, you call me and I will be glad
8      to help you. And I said, Well, thank you.
9   Q. Did he tell you anything about any
10     conversations he had with Standard Fire?
11  A. Other than -- I mean, I read his -- I read
12     y'all's report that y'all sent where, you
13     know, y'all talked to him or somebody talked
14     to him.
15  Q. But he didn't tell you anything in that
16     conversation?
17  A. He just said that he had talked to them and
18     that he said that -- he showed them the
19     pictures and he said that he was informed by
20     somebody from Standard Fire, well, this is a
21     coverable -- something under -- and I don't
22     know the insurance lingo; but something that
23     this is a coverable deal, that Mr. Sanders

Page 88

1      and them are eligible to go stay somewhere
2      else if the house is not liveable,
3      dah-dah-dah, dah-dah-dah. And he said, I
4      asked them did they tell you that before and
5      they said no.
6   Q. At some point, were you made aware or were
7      you told that another inspection -- Standard
8      Fire wanted to do another inspection of your
9      home --
10  A. All right.
11  Q. -- after you received this check?
12  A. Never -- I received a letter that we refused
13     and -- well, let me back up.
14  Q. Okay.
15  A. I got a call. We filed suit on November
16     the 3rd. There was a letter evidently
17     written November 2nd, mailed from Atlanta,
18     Georgia, on November the 3rd and obviously
19     didn't get to my house until November the 4th
20     or later. And I refused that letter
21     because -- on the advice of my attorney. I
22     had told -- a woman called me and said, we
23     want to send somebody in your house. And I

Page 89

1    said, we filed suit and you need to contact
2    my attorney; I've been told all contact just
3    go through him.
4    Q. Okay.
5    A. And that was it.
6    Q. Did anyone ever show up at your house trying
7       to inspect it?
8    A. Not that I know of.
9    Q. Tell me, Mr. Sanders, what you understand
10      Mr. Davis did in terms of the assault with
11      your wife.
12   A. I understand he grabbed my wife and hurt my
13   wife and told her she would accept what he --
14   what he give her. And that's what I
15   understand him to do. I understand he
16   committed assault and battery here in
17   Montgomery County. That's what I
18   understand. And when he comes down here,
19   we'll address that.
20   Q. When did you learn about that?
21   A. It ain't been that long ago. It was right
22   before we was originally going to do the
23   first mediation. And, of course, I didn't

Page 90

1    know anything about it. And Chris called me
2    and said that Kim kept calling down here
3    wanting to know who was in mediation, who was
4    going to be at mediation. And he said, Did I
5    know anything about it; and I said, no, I
6    didn't know -- I called. And I -- so when I
7    got home, I questioned Kim about it. And she
8    told me what that bastard did about him
9    putting his hands on her and hurting her.
10   Q. Okay.
11      MR. ELY: Let's go off the record just
12      a minute.
13      (Lunch recess)
14   Q. Mr. Sanders, did you take a number of
15      pictures of your home at some point?
16   A. Yes, sir.
17   Q. And I will represent to you what I'm going to
18      mark as a composite Defendant's Exhibit #2 --
19      and we can do it when we're done. I've got
20      the individual photographs. We're marking
21      and numbering them in the bottom corner, the
22      photographs that your lawyer produced to us
23      in this litigation. And I believe these are

Page 91

1       the photographs that you took.
2       If you will take a look at this first
3       set and just thumb through it and see if
4       those are the ones you took and tell me. You
5       can probably tell pretty quickly.
6    A. Yeah. I mean --
7    Q. I think there are some pictures of your son
8       back there that may tell you real quick.
9    A. Uh-huh. This --
10   Q. Those are the ones you took?
11   A. Right.
12   Q. All right.
13   A. Did I not take these? Is that what you said?
14   Q. I think so. I'm talking about the whole
15      set. I'm just trying to get you to --
16   A. Yeah. Yeah. Yeah.
17   Q. The copies may be --
18      MR. ELY: Do you have the originals?
19      MR. SANSPREE: It's on CD, but I
20      should.
21      MR. ELY: We may need to do what we
22      need to do -- do whatever we can
23      to identify these.

Page 92

1       MR. SANSPREE: Did I send y'all the
2       CD?
3       MR. ISENBERG: I think we got the CD.
4       MR. SANSPREE: Okay.
5    Q. Let's go through them. And what I'm going to
6       ask you to do is to look at the pictures,
7       look down here in the corner and say number
8       one and tell me what it depicts, if you can
9       tell.
10   A. Okay. This is -- appears to be the foyer at
11      the front door.
12   Q. Okay.
13   A. Floor.
14      MR. SANSPREE: And for the record, this
15      is one.
16   A. Number one.
17   Q. One. The foyer has hardwood floor?
18   A. Right.
19   Q. And this is -- is this the wall or the door?
20      I can't tell. That's the door? There's a
21      thing --
22   A. Uh-huh.
23   Q. -- here at the bottom. And that's the front

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.    7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

24 (Pages 93 to 96)

Page 93

1    door?
2    A.  Yes.
3    Q.  Now, is the foyer warped?
4    A.  Yes, it is.
5    Q.  Is there anything on that picture that
6        would -- and I know sometimes things are hard
7        to show up on pictures. Anything on that
8        picture that would tell me or show me where
9        the warping is or any damage?
10   A.  Well, yeah. You can see here, because the
11       floor warps in the middle and comes back up,
12       and you can see how it's tight against this
13       side and then in the middle, it's all -- it's
14       bowed in.
15   Q.  Yes, sir. And along the lines of what you
16       said, I see a little dark shading here
17       underneath door and it stops over here. Is
18       that what you're talking about?
19   A.  Yes, sir. But the floor, like you say --
20       and, obviously, I'm not a photographer; but
21       if you come -- your adjustor saw it. But the
22       floor dips in, I mean, where it's bowed up.
23       And over here it's -- it's sit -- it's

Page 94

1        standing up.
2    Q.  And you're saying over here, it's on the --
3    A.  On the left-hand side of the picture.
4    Q.  -- left side of the picture?
5    A.  Right.
6    Q.  Let's take a look at number two. Is that the
7        same thing?
8    A.  Right. And this is where the water sit on
9        the floor and just took the finish off. The
10       water was deep enough where it just sit on
11       the floor, and that's just where it -- it
12       just buckled it off, came off. That's number
13       two.
14   Q.  Is that something -- is the foyer area
15       something that y'all had a mat or like a rug
16       for people to walk on?
17   A.  There is a rug there, but we don't use that
18       door to come in and out of our house. We use
19       the side door.
20   Q.  All right. Number three?
21   A.  This right here is a -- number is in the
22       living room cabinet. Our surround sound sits
23       below this and above it. And this is where

Page 95

1        the water came through the roof in the living
2        room. This is the living room. And just the
3        water came down and just --
4    Q.  Do you mind if I come around here and look
5        over your shoulder?
6    A.  No, I sure don't.
7    Q.  So I can maybe describe it.
8    A.  Like, see, this is the cabinet, book cabinet
9        in the -- in the living room. And the water
10       came down. One of the first places we
11       actually had water -- when it knocked the
12       surround sound out, water just poured down
13       this -- the air handler room is right behind
14       here.
15   Q.  When you say right behind here, on the right
16       side?
17   A.  On the right side.
18   Q.  The wall on the right side.
19   A.  Right. And that's what it did.
20   Q.  Is there anything in there that shows the
21       water marks, or was there any damage that
22       this is particularly showing?
23   A.  Well, yes, because it's --

Page 96

1    Q.  Separation?
2    A.  Yes. The separation all the way down it --
3    Q.  And in the middle?
4    A.  -- and all on this side, right.
5    Q.  What you're showing me is the line that runs
6        down the middle of the photograph?
7    A.  Yes, sir. All right. Number four is -- hold
8        on. Give me just a second. Let me -- let me
9        think of what this is. Oh, I know. This is
10       the fireplace --
11           MS. SANDERS:  Cabinet.
12   A.  Oh, this is the top of the cabinet, but this
13       is the -- is that not the fireplace right
14       over here, above the fireplace? Ain't that
15       the --
16           MS. SANDERS:  It's the cabinet door
17               that's open.
18   A.  Oh, yeah, yeah. I'm sorry. This is right
19       below number three. This is what sets below
20       number three. And as you can see, this is
21       the separation that you saw in the previous
22       picture. And some other pictures will show
23       these doors do not flush together anymore.

WILLIAM P. SANDERS, ET AL. v STANDARD FIRE INS. CO., ET AL.
DEPOSITION OF WILLIAM P. SANDERS

7-19-2005

25 (Pages 97 to 100)

**Page 97**

1    They're all separated all the way down and
2    all the way up.
3    **Q. And that's where the water flowed down from**
4    **the --**
5    A. Yes, sir.
6    **Q. When the water was flowing down, was it a --**
7    **could you -- was it a visible stream?**
8    A. Yes. When it -- when I got home that night,
9    yes, sir, it was a visible stream. Number
10    five, this is also the -- the -- this is the
11    little cabinet and this shows the upper
12    shelves, individual shelves, above the
13    cabinet. As you can see, there is a -- and
14    you can't make it out very well on this
15    picture, but down through the middle of the
16    picture is where the sheetrock comes
17    together. And it just separated right in the
18    middle of this book -- bookshelf.
19    **Q. Okay.**
20    A. All right. Number six is the -- is the
21    bookshelf also. And you can see where the
22    cabinet door will not shut now that it's
23    warped, that it all fell down. It won't shut

**Page 98**

1    anymore.
2    **Q. This is a built-in cabinet?**
3    A. Yes. Yes. Number seven is -- right here,
4    this is where you got them shut. You can see
5    one is -- now, hold on. Let me see if that's
6    what I'm looking at. Yeah. I think this
7    shows the cabinet doors where, like I say,
8    one is higher than the other now. They're
9    not flush anymore.
10    **Q. Okay.**
11    A. Number eight is the ceiling. And you can see
12    water. Of course, it has since dried. This
13    has been several weeks after the hurricane,
14    but you can still see the water spots right
15    here. I believe this one is in the hallway.
16    **Q. Do you know when you took these?**
17    A. It was right after I got that -- that
18    disgusting check I got.
19    **Q. Towards the end of October, first of**
20    **November?**
21    A. Yes. Yes, sir.
22    **Q. Okay.**
23    A. Number nine here is also the ceiling with

**Page 99**

1    another water spot here. And you can't see
2    it very well on this picture but --
3    **Q. That's in the hallway?**
4    A. Yes, sir.
5    **Q. Okay.**
6    A. Number 10 obviously didn't come out very
7    well. I really don't know what that is.
8    **Q. Okay.**
9    A. All right. Number eleven is the blinds in
10    the living room. And, of course, like I say,
11    if you look at the disk -- obviously, this is
12    not a very, you know, good picture. If you
13    look at it on disk or get a better quality of
14    paper, it will obviously be a better picture;
15    but you can see on these, the blinds in the
16    living room hasn't been -- this may be one in
17    the bedroom. This appears to be one in the
18    living room. It looks like a big window
19    where these are all buckled. And maybe you
20    can see it better on another picture, but
21    that's what it's -- that's what it was taken
22    for.
23    **Q. Are the slats warped?**

**Page 100**

1    A. Yes.
2    **Q. Okay.**
3    A. Ten, this is --
4    **Q. I think that's 12.**
5    A. I'm sorry.
6    **Q. That's okay.**
7    A. Number 12 -- I was born in the '50s. Number
8    12 -- where did my eyes go, man? This is the
9    living room. It appears to be the living
10    room. Does it appear to be the living room
11    to you? And you can see here, this is --
12    there's three big windows right here all
13    together, and this is where water was just
14    driven in because the hurricane came facing
15    the east side of the house. And all this is
16    buckled, and this is just pure rotten. And,
17    of course, obviously, it's worse today than
18    it was there. It's just -- it's rotten.
19       This is my son's --
20    **Q. Thirteen?**
21    A. Thirteen is my son's bed, bunk bed. And it
22    sits right here next to a window. There's a
23    window to the right. And water come through,

Page 101

1    and it warped this whole bed. It doesn't sit
2    down flush anymore. It sits up and just --
3    it -- it just -- it got so wet that it
4    actually just warped the wood.
5    Q. What about the mattresses on the bunk beds?
6       Did they get wet?
7    A. They got wet. Everything on here got wet,
8       yes, sir.
9    Q. And you still have the same mattresses in
10      there now?
11   A. Yes, sir.
12   Q. The water in your son's bedroom, did that
13      come from the ceiling or from the windows?
14   A. Both. It even came through his closet, you
15      know, through the ceiling, through the
16      windows and all through the attic obviously.
17      His room was really bad, as was my
18      daughter's.
19   Q. And are they on the front side of the house?
20   A. Yes. Both on the east side of the house.
21      Okay. Number 14 here, this appears to
22      be -- it's obviously -- number 14 shows the
23      crown moulding in the living room. Like I

Page 102

1    say, this is -- oh, I know what this is. I
2    believe this is at the top of the roof of the
3    ceiling. And of course you can see it right
4    here. That was number -- what was it? 14?
5       All right. Number 15 is -- I can't --
6    there again, crown moulding. And I guess
7    it's in the living room. And it's right
8    through here. This is the living room
9    towards the west side of the house where the
10   water came through the top of the roof
11   through the crown moulding.
12   Q. Okay.
13   A. And, of course, obviously, this is several
14      weeks later. This picture appears to be the
15      living room again. It appears to be another
16      picture of the living room, number four --
17      number 16?
18   Q. Uh-huh. 16.
19   A. And you can see the rotten wood. And this
20      is -- like I say, this is where the water
21      came in and just settled, and it just rotted
22      the wood and buckled it. The same thing here
23      with number -- number 17, same thing, just

Page 103

1    showing another angle of that.
2       All right. Number 18, it -- it's some
3    crown moulding somewhere, and I obviously
4    just can't make that out. I mean, I don't
5    know where that one is.
6       All right. Number 19 is -- this is
7    crown moulding up in the living room, and
8    this is where it has separated here. And --
9    and like I say, it came through the crown
10   moulding from the attic, and this is on the
11   east side of the house also. It just
12   separated.
13      Okay. These next pictures are going to
14   be of my son and -- and I want you to know my
15   son is -- and I know you probably don't care
16   to hear all of this, but I mean I'm here to
17   tell you. This is my shot at telling you
18   other than when I tell it in front of the
19   jury.
20   Q. Yes, sir.
21   A. And this is -- my son has suffered from this.
22      He has -- he has -- he has got marks on him,
23      as Dr. Highley will testify, that he will

Page 104

1    always have. He may always have asthma. And
2    like I say, some son-of-a-bitch come in my
3    house and assaulted my wife and put my kids
4    through this. And I'm telling you, I'm upset
5    about it. And this is what my family has
6    went through from some guy who come down here
7    from Ohio to teach me a lesson. Okay? This
8    is what we -- we've had to endure is the
9    marks my son is going to have for the rest of
10   his life. And now my daughter has had to
11   have surgery, too. Dr. Highley told me that
12   he may have these scars for the rest of his
13   life. And -- and I'm sorry for --
14   Q. That's all right. That's what we're here to
15      find out about.
16      All right. Let's do these as a group.
17      You want to do -- let's go 20 -- what's your
18      son's name?
19   A. Jacob.
20   Q. Is he eight?
21   A. Yes, sir.
22   Q. And I understand he was -- he's had allergy
23      problems for some time even before this,

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 36104
ph: (334) 263-0261; fax 263-1243

WILLIAM P. SANDERS, ET AL v STANDARD FIRE INS. CO., ET AL.
DEPOSITION OF WILLIAM P. SANDERS

7-19-2005

Page 105

1    right?
2    A. He's had -- yes, he's had allergies. Never
3    with breathing, nothing to do with breathing.
4    Q. Is he now having breathing problems?
5    A. Absolutely.
6    Q. Is he being treated for his asthma?
7    A. Absolutely.
8    Q. In terms of his allergies, was he tested to
9    find out what he's specifically allergic to
10   before this?
11   A. Well, the doctor said that there's so many --
12   twenty-something thousand things, that --
13   that they can only test for certain things.
14   He said -- Dr. Meadows, he's the pediatric
15   allergy specialist here in Alabama. He said,
16   there's no need to do that, he said, because
17   most of them you can't even test for. And as
18   Dr. Highley said, in their practice and their
19   opinion and their feelings, that this is a
20   direct cause of mold.
21   Q. Was --
22   A. He's never had -- never done this ever.
23   Q. The allergies that he had before this, what

Page 106

1    were the symptoms? Was it -- I mean, because
2    it can manifest itself in a bunch of ways.
3    Coughing, sneezing, sinus infections, rashes,
4    anything like that?
5    A. He may have had -- like I say, he's had some
6    small rashes, nothing ever on this level. He
7    had -- let me tell you how my son has
8    suffered from this. He's had bleeding. My
9    son has woke up in the mornings with this and
10   still wakes up in the morning and look at me
11   and ask me, Daddy, am I going to die from
12   this? Because there's blood on his pillow.
13   Me and his mother have to sit up with him on
14   shifts at night because my son can't
15   breathe. He can't breathe. And just like
16   the doctors said, you're still in that
17   atmosphere. It's no telling what it's going
18   to do to your son. You're still living in
19   there.
20       And -- I mean, do you know how that is?
21   And like I say, I don't want to get off the
22   subject, but to have your son look up to you
23   and -- like I'm going to let him die? Daddy,

Page 107

1    are you going to let me die from this?
2    Because of this bullshit we're going
3    through? I mean, it's wrong. And I'm
4    sorry. But he's never had -- ever had any
5    rash like this. He never could not breathe.
6    He's coughed all night. Dr. Meadows and them
7    said it's turned into asthma. He now has
8    asthma. He was never diagnosed with asthma
9    until now. And -- and this is why.
10       I mean, I want you to look at -- and
11   these pictures do it no justice, because we
12   can get better pictures than this. I --
13   Q. I've seen them -- I've seen them on the CD.
14   A. This -- this is absolutely -- this boy's skin
15   was on fire. He couldn't even touch his --
16   he cried for days. I mean, we could do
17   nothing. I took him to the doctor every day.
18   Q. Let me ask you this. Was this right after
19   the storm?
20   A. Within a couple of weeks.
21   Q. This is during this time period we've been
22   talking about?
23   A. Absolutely.

Page 108

1    Q. Let me ask you this in terms of -- and your
2    wife may be a little bit better able to
3    answer this. Is he on medication now?
4    A. Yes.
5    Q. Do you know what he's on? I'll ask your wife
6    about it. How is he doing today?
7    A. He has his good days and his bad, some days
8    better than others. And, you know, it
9    just -- when it rains -- to this day, when it
10   rains and gets damp, he can't breathe.
11   Q. His main problem right now, is it the asthma
12   or is it the skin rash?
13   A. It's both.
14   Q. It's both?
15   A. And just like Dr. Highley told me, and
16   Dr. Meadows, We can't tell you it's going to
17   get any better. We can tell you that in our
18   opinion, this is a direct cause of mold.
19   Q. Okay.
20   A. And, I mean, I -- you know, like I say, I
21   mean, I -- I'm just a regular old guy. I'm
22   just a working guy just like everybody else
23   is, but I don't know what to tell my son.

Page 109

1    You know, I don't have any money. I don't
2  have any money to leave. I don't have any
3  family to go stay with. I don't have any
4  family here in Montgomery. We got no choice
5  but to live in this house and do the best we
6  can. And it ain't good enough. And do you
7  see how -- how I'm -- this is why I'm so --
8  I'm so adamant about this. I mean my kids
9  are suffering. My daughter has just had
10  surgery again because of -- two doctors'
11  opinions -- because of this, direct cause of
12  this. And this is what I go through because
13  some bastard comes down here and tells me
14  I am entitled to nothing and puts his hand on
15  my wife.
16    Should we have to go through that?
17  Absolutely not. I mean it's an injustice.
18  They sold me a policy that said, you know,
19  that I would -- everything -- if I filed a
20  claim and had a justified claim, that it
21  would all be replaced, wouldn't be no
22  depreciation in the payments of this stuff.
23  That's not true. They lied to me. I filed a

Page 110

1  claim. They didn't pay nothing. What they
2  did pay was depreciated amount. They fixed
3  several things, didn't fix -- fixed several
4  little things. I mean, they lied to me
5  They lied to me. I wouldn't have bought this
6  policy if I knew I was going to go through
7  this shit, I mean.
8    And if they would have paid my money
9  like they owed me, like they promised me
10  would pay, my son wouldn't be like this
11  today. He wouldn't be suffering. My
12  daughter wouldn't be suffering. We wouldn't
13  be suffering as a family. We're having to go
14  through this. I mean, this is traumatic.
15    I mean, I know you do this every day.
16  And it may be dramatic to you. Well, it's
17  the real world to me. This is what -- you
18  know, I wake up and my son is crying. He's
19  eight years old. And asks me, Daddy, am I
20  going to die? And blood all over his pillow
21  because of this crap.
22  Q. When you say the blood is all over his
23    pillow, where is he bleeding from?

Page 111

1  A  From his nose
2  Q. I mean, he's having nosebleeds, too?
3  A. Yes, sir.
4  Q. Your daughter -- you told me your daughter
5    just had surgery. I knew -- and Chris had
6    told us she just had surgery. What, she had
7    her adenoids removed?
8  A. And her tonsils.
9  Q. And her tonsils removed? How is she doing
10    now?
11  A. She's better. He told us it would be a few
12    weeks. You know, it's only been a couple of
13    weeks or so. And she's getting better.
14  Q. What kind of symptoms did she have?
15  A. She had Strep throat about four or five times
16    within a three- or four-month period.
17  Q. Has she had anything -- any symptoms before
18    this? I'm assuming this was the three- or
19    four-month period leading up to the surgery
20    when she was having recurrence of Strep
21    throat.
22  A. Yes.
23  Q. And before then, she hadn't had anything?

Page 112

1  A. No, sir.
2  Q. Did she have any asthma or rash problems?
3  A. No, sir. Not as of right now, no.
4  Q. Have you had any?
5  A. No, sir.
6  Q. Has your wife had any?
7  A. I mean, she can answer that, but --
8  Q. That you know of.
9  A. No.
10  Q. And so these photographs, photographs 21
11    through 39, let me go through them real
12    quick.
13  A. And -- and -- and I want to go through these
14    pictures myself. I don't want to be ugly,
15    but I want to point this out.
16  Q. Okay. I'm looking, so I can -- we're going
17    to let you go through them in as much detail
18    as you want. I just want to make sure I've
19    got a group together that I can tell the
20    court reporter such-and-such number through
21    such-and-such number. Okay. I've got 21
22    through 39 of Mr. Sanders' son of the -- you
23    tell me what they're of.

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 36104
ph: (334) 263-0261; fax 263-1243

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.                    7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

**Page 113**

1    A.  Okay.  18 is --
2    Q.  This is 21.
3    A.  I'm sorry.
4         MR. SANSPREE:  And, obviously, the CD
5         pictures are better.
6         THE WITNESS:  Absolutely.
7    Q.  That's fine.  You can tell me what they
8         are -- the reason you made them and what they
9         are intended to show.
10   A.  Because -- and I mean this.  And this has
11        nothing to do with y'all.  I mean, I know
12        you're doing your job, and that's fine.  And
13        I hired him to do a job for me.  And when we
14        go to trial, I want -- this ain't the picture
15        I want.
16   Q.  No.  That's --
17   A.  I mean, I want --
18   Q.  These are copies for my file.
19   A.  I want the jury to see the real -- of course,
20        he'll be there.
21   Q.  We --
22   A.  But anyway, that's -- that's 21.  All right.
23        And 22 is obviously his right leg and just

**Page 114**

1        awful sores on his leg.
2    Q.  I'm sorry.
3         (Brief pause)
4    A.  Okay.  22, as I said, just shows his right
5         leg at a different angle.  23 -- and, sir, I
6         want you to look at that.  I mean, I'm
7         serious.  That right there is the most awful
8         thing.  You should have seen -- I mean he
9         couldn't -- you couldn't touch his skin.  You
10        couldn't put anything on his skin.  He was
11        just in agony.  I mean -- I mean, the picture
12        speaks for itself, and that does it no
13        justice.  I mean, and that's -- and, you
14        know, we kept thinking, what the hell is
15        wrong, what's wrong with him?  Well, we know
16        now what was wrong with him, what is still
17        wrong with him.
18        And 24 just shows a picture of his
19        eyes.  And that's when Dr. Highley first
20        pointed that out to us.  He said, you see his
21        eyes?  That's letting you know he's having a
22        reaction to something.  And, of course, come
23        to find out it was mold, his reaction.

**Page 115**

1         This is his stomach.  You can't see it
2    very well in this picture, but the rash
3    started on his chest and went all the way
4    down his whole body.  There again, 26 is --
5    depicts the same thing, same picture.
6         27 shows his right thigh, all over his
7    buttocks area, lower back.  He's just -- he's
8    just eat up from head to toe.  And 28 shows
9    his knee and shows his -- his lower leg of
10   his right -- right leg.
11        29, you see his lower leg, the festering
12   sores.  And that's what he had.  And to this
13   day, he still has scars on his leg.  And
14   that's what -- Dr. Highley has tried him on
15   so much stuff.  And his thing is obviously,
16   you know -- I won't even talk about trying to
17   get it under control.  We're living in the
18   house.  Okay?  But is to -- hopefully, this
19   won't scar him for the rest of his life, I
20   mean, because he's got it on his neck and on
21   his ears.  And the concern is now that he may
22   in fact have these scars for the rest of his
23   life.

**Page 116**

1         30, there again just shows his -- shows
2    his legs.  31, same picture of his legs
3    again.  32, closeup of -- of the sores.
4    And -- and that's how they'll do.  They start
5    as a little sore, and then they'll just like
6    spread, and then they'll fester and ooze
7    stuff.  And, of course, he's taking shots and
8    everything else for it, you know.  And 33,
9    same thing, the back of his -- back of his
10   leg.  34, same thing.
11        And 35 shows his back kind of at a
12   different angle.  He's got these spots here
13   where -- now where -- I mean they're just
14   covering his back.  It's just he's -- he's
15   even -- he's even embarrassed to take his
16   damn shirt off outside because of this
17   bullshit.  You know, when we go swim or stuff
18   and he asks me, Daddy, can I leave my shirt
19   on?  Because he's got these damn sores and
20   the other kids, you know, make fun of him;
21   but -- 36 shows his left forearm, not a very
22   good picture, but the sores usually start in
23   the crease of his arm.  And you can see --

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.          7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

30 (Pages 117 to 120)

Page 117

1      you can see a little bit in this picture is a
2      whole big red patch.
3          Basically, he's covered from head to
4      toe, y'all. This is the back of his neck.
5      You see it's on his ears also. And it
6      doesn't show a very good picture of it,
7      but -- and there is a closer up of his neck,
8      the sores on his neck. And I think that's
9      all of them as far as him.
10  Q.  All right. You want to keep on moving?
11  A.  Yes, sir. Yes, sir.
12  Q.  I'll see if I can't put them in a set, and
13      maybe this thing will go a little quicker.
14          All right. I think 40 through 54.
15  A.  Okay. This is the -- obviously, a picture of
16      the roof. We're facing -- let's see. We're
17      facing -- it's facing south. And this area
18      here -- and this is not a very good picture.
19      There are better pictures once again. This
20      whole section here of the house -- this is
21      right above my daughter's bedroom.
22  Q.  Okay.
23  A.  And this whole section of the house here is

Page 118

1      where shingles were missing. This is the job
2      that the fellow did who came and tacked the
3      thing. Of course, they're all on the middle
4      of the house, also. This is not the only
5      area.
6   Q.  And you're talking about this lower
7      section --
8   A.  This lower section.
9   Q.  -- of the photograph? These are the
10      temporary repairs that were made?
11  A.  Yes, sir.
12  Q.  Okay.
13  A.  And, of course, we got pictures of that,
14      but --
15  Q.  Yeah. I think there is a bunch more in there
16      on that.
17  A.  Yes. And -- and then -- and this is the same
18      thing just to note that I read in the
19      enforcer -- you know, this guy that come down
20      here to teach us a lesson -- who said there
21      was never any shingles missing from this
22      house. I'm still getting over, you know,
23      that rocket scientist statement there. This

Page 119

1      is -- this was after, obviously, that the guy
2      came and -- well, both guys, both adjustors
3      had been there at this point.
4   Q.  Right.
5   A.  I mean, and this is just some missing -- two
6      little missing pieces right here on the roof
7      that --
8   Q.  The two small triangle pieces on --
9   A.  Yes, sir.
10  Q.  Along that line there in the middle?
11  A.  Yes, sir, that were missing. This is up on
12      the top of the house, as you can see the
13      ridge here, and it's all cracked. All these
14      are loose. Like I say, I -- I won't go into
15      it. I read -- I've read the guy's report,
16      you know, where he says there's nothing --
17      you know, nothing wrong with the roof.
18  Q.  Let me ask you a question about that.
19  A.  Yes, sir.
20  Q.  Have you been out there and seen these
21      shingles in a wind? Do they flap or --
22  A.  Yes.
23  Q.  They're still flapping?

Page 120

1   A.  Well, I think we've probably done as well as
2      we could do. Of course, we -- it has to be a
3      pretty good rain. You know, just a little
4      old shower doesn't make them flap, obviously;
5      but when it comes through -- just like with
6      the last little hurricane we had -- and I
7      know it didn't hit us like we thought; but,
8      yeah, I had to go out there and do some more
9      because I mean that roof is just -- is ready
10      to fall apart. And yes, if it comes a -- if
11      it comes a pretty good little storm, I'm back
12      up on the roof. I'm back up there with the
13      caulk and with the bucket.
14          Because it doesn't just leak. My roof
15      just doesn't leak where I was originally
16      missing shingles. My house, it leaks all
17      over. It's a different spot every time.
18      It's not that he didn't do a good job. It's
19      just like he told me and I told you earlier,
20      this whole roof is tore all to pieces.
21  Q.  And the leaks in the last -- let's say since
22      he did the repairs last September, it's been
23      what, 10 months?

| | |
|---|---|
| Page 121 | Page 123 |

**Page 121**

1  A. Yes, sir.
2  Q. About how many times would you say you've had
3     to go up there and make temporary repairs
4     because you've seen leaks in your attic from
5     storms?
6  A. Numerous is all I can tell you. Just about
7     every time it has rained.
8  Q. Would you say it would be more than 20?
9  A. At least 20.
10  Q. And these leaks -- the way you see these
11     leaks, are these leaks actually coming into
12     the house; or are you going up in the attic
13     and seeing now because you're aware --
14  A. I'm going up in the attic and try to catch
15     them before they hit, because --
16  Q. Every time it comes a hard rain, you go to
17     the attic to try and find them --
18  A. Yes, sir.
19  Q. -- because you know there are going to be
20     some there?
21  A. Yes, sir. When I pull up at my house, like
22     if I'm not there or whatever, the first thing
23     I do is go outside and see how many shingles

**Page 122**

1     are gone now. Because I have some shingles.
2     You know, he left me the shingles because I'm
3     always up there retacking different places,
4     you know.
5  Q. So during the 10-month period since the loss,
6     you've had shingles come off at various times
7     in various storms?
8  A. Absolutely.
9  Q. And you'll have to go back up there to find
10     that piece of shingle if it's something you
11     can identify and put it back?
12  A. Yes, sir.
13  Q. Or you'll have to use an additional
14     shingle --
15  A. I take a --
16  Q. -- and cut it or do whatever you have to do
17     to get it back?
18  A. That's correct. And I go up in the attic
19     after I do that and try to caulk, you know,
20     to hit it from both sides, you know, because
21     I mean, obviously, my house ain't going to be
22     fixed. And I am aware of that. And so I try
23     to stop it before it hits the --

**Page 123**

1  Q. Yes, sir.
2  A. -- you know, before it gets down that far,
3     you know.
4  Q. Have you -- and along those lines -- and I
5     understand exactly what you're telling me --
6     have you been able top stop the water from
7     getting into the insulation and back into the
8     ceilings in the last eight months by doing
9     that?
10  A. It has done it on a couple of occasions,
11     still has reached that, because like I
12     wouldn't be home or whatever. But if I'm
13     there to get it with buckets and the caulk
14     and then getting up there with that, I've
15     pretty much been able to keep ahead of it.
16  Q. So by and large, by you making those efforts
17     and doing all this, you've been able to keep
18     the interior from getting any water in
19     addition to what it got over the last -- you
20     see what I'm asking -- in the last eight
21     months?
22  A. On occasion. There has been times that
23     I haven't been able to stop it; but if I'm

**Page 124**

1     there, I usually have been able to stop it.
2  Q. Okay.
3  A. And like I say, we've had them come off
4     several times and it will be such an area I
5     had to buy more shingles. So I would have
6     to tarp, especially on the front of the
7     house. We haven't got a picture of the front
8     of the house yet. But up here I've had to
9     tarp it several more times, too, until I
10     could -- because I would be missing such a --
11     you know, several rows of shingles because
12     they still flap. But anyway.
13  Q. Okay. How did you fair in the last storm
14     last week?
15  A. I lost some shingles. Like I say, it
16     certainly wasn't as bad as I thought; because
17     I thought I was just fixing to get hammered.
18     And I was truly expecting to get hammered. I
19     sent them away. And, of course, I had to
20     work again, obviously, but the sheriff let me
21     go home because he's well aware of all this
22     that's going on. So he sent me home as my
23     first thing to see if the water was pouring

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.                    7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

32 (Pages 125 to 128)

Page 125

1       in my house; because he knows the condition
2       of my kids. He's aware of everything that is
3       going on.
4           And I was not -- I was missing several
5       shingles and I had several that were blown
6       up, but nothing to the extent of the first
7       hurricane.
8   Q.  But you didn't have a bunch of water in the
9       living area?
10  A.  I did not.
11  Q.  All right.
12  A.  And this 35 -- is that what that is?
13  Q.  43. You've got them upside down, I'm afraid.
14      You want me to just do the numbers? How
15      about that?
16  A.  Yeah, yeah, you do it, because I can't see
17      them.
18  Q.  I don't want you to strain your eyes.
19  A.  I'll just --
20  Q.  I'll holler out the numbers.
21  A.  Now, if you cut a track out there, I could do
22      that. Up close I have a problem. But
23      anyway, whatever number you said this was,

Page 126

1       there's a couple more little pieces missing,
2       I assume -- I'm guessing on the other side of
3       the house.
4   Q.  And that's along an area where the roof
5       sections join?
6   A.  Yes, sir.
7   Q.  Okay. 44?
8   A.  44 is the back of the house. And like I say,
9       these obviously are not closeup pictures, but
10      you can see one that's broke off there. And
11      I have -- this piece here, because the back
12      side is obviously not as bad as the front
13      side, and I have replaced this particular
14      shingle several times for whatever reason. A
15      good wind just blows it off.
16  Q.  Okay. 45?
17  A.  45 is -- you can see that the roof is bowed.
18      There's just a bow in it. And it's come
19      apart. And, you see, that's what -- and I
20      know -- and I'm certainly not blaming you. I
21      know you're doing a job. And my anger is not
22      toward either one of you. I promise you
23      that.

Page 127

1   Q.  We understand.
2   A.  You've the only one that I've been able to
3       talk to, so I'm kind of venting right now.
4       And it gets me kind of upset how somebody
5       could come to my house and look at this shit
6       and tell me that I don't have any damage, I
7       mean, and to let my family suffer. I'm
8       sorry. And I'll get off of that.
9   Q.  Hang on. Let me ask you about that.
10  A.  All right.
11  Q.  You said something about a bow in the roof?
12  A.  Yes, sir.
13  Q.  Now, I understand your testimony about the
14      shingle problems. And to me, a bow in the
15      roof is a different thing. Are you saying
16      that the board -- the board, plywood,
17      underneath the roof is actually bowed; or is
18      this bowing that you're talking about in the
19      middle there, is that related to the
20      shingles?
21  A.  All I can tell you is this on that -- because
22      I am not a roofer; but I know when the roofer
23      came out here, he told me, Mr. Sanders, he

Page 128

1       said, I'm going -- I'm going to tack your
2       roof for you, obviously, to try to stop this
3       leaking. He said, But when you get a new
4       roof, you're probably going to have to have
5       some -- some of the plywood replaced because,
6       he said, it's got under there, it's wet; it's
7       probably going to bow.
8           And as you can see, as the months have
9       gone by, I have places that's bowed. And
10      he's told me what that was, that the
11      sheetrock -- I mean the --
12          MR. SANSPREE:  Plywood.
13  A.  -- plywood has now become rotten. And it
14      bows when it becomes rotten.
15  Q.  But you haven't observed any plywood that you
16      can say you've seen that's bowed?
17  A.  I can just see it from, you know, bowed up
18      under the shingles. I have not -- obviously,
19      I don't try to pull shingles up. I try to
20      tack them. So I certainly have not explored
21      that avenue.
22  Q.  All right. That's fair enough. 46?
23  A.  46 is -- and, of course, you see there's the

Page 129

1 front of the house, and there's another ridge
2 line. And you can see that that is another
3 place that's bowed up. And -- and y'all, I'm
4 telling you, this -- and it's worse now than
5 this. I mean I'm not trying to blow no smoke
6 up you, but it was this bad when he came out
7 there. This is --
8 **Q. This is a --**
9 A. -- within a couple of --
10 **Q. This is an early photo.**
11 A. Yeah.
12 **Q. Right. Okay. 47?**
13 A. 47, you can see the -- just, you know -- I
14 don't know what to say. It's just a damaged
15 roof is all I know to say.
16 **Q. Those marks that you're talking about, those**
17 **black marks there?**
18 A. Yes, sir.
19 **Q. 48?**
20 A. 48 just shows another angle of them two that
21 I showed already, I believe, and I showed
22 that and there it is. As you can see, I keep
23 my yard up very nice. You see I used to have

Page 130

1 a nice house to go with it, but the yard
2 still looks pretty good.
3 **Q. 49?**
4 A. 49 is -- you can see the hits on the roof,
5 and it's just -- and I'm just showing --
6 **Q. Yes.**
7 A. -- you know, that simply.
8 **Q. 50?**
9 A. Okay. 50. Let me -- let me tell you this.
10 And I remember the day this guy that put his
11 hands on my wife came out. Like I say, I'll
12 address him when he gets to Montgomery. You
13 see this stuff in the drain here?
14 **Q. Yes.**
15 A. This stuff here that is depicted is obviously
16 the stuff on top of the shingle. You know
17 that. If you have a bad storm or if you had
18 a hail damage, you know, you see this stuff
19 on your ground. It doesn't take a -- I mean
20 I'm not a roofer. I don't have to be a
21 roofer to know this. This stuff in this
22 drain -- and it's still there -- is that
23 thick. It's an inch or two thick. And I

Page 131

1 asked, you know, several people how could
2 this guy if he's an adjustor -- if he's an
3 adjustor out to, you know, try to fix what's
4 rightfully, you know, mine to fix, how can he
5 look at this and say I don't need a new
6 roof? I mean that just amazes me. I mean
7 anybody that's from the South knows it's time
8 for a new roof, fella. I mean --
9 And this again is just showing a
10 different side of that. Just --
11 **Q. 51.**
12 A. 51 is just showing --
13 **Q. Showing more of that residue?**
14 A. More of the residue.
15 **Q. 52?**
16 A. 52 is that same side of the house. And this
17 is the area that --
18 **Q. And that was one of the first pictures we**
19 **looked at?**
20 A. Yes, sir. Yes, sir.
21 **Q. 53?**
22 A. 53 is the -- that's the same thing.
23 **Q. Okay.**

Page 132

1 A. Same thing as that. And fifty --
2 **Q. Four.**
3 A. -- four, this is the front of the house.
4 **Q. Okay.**
5 A. This is my son's bedroom here.
6 **Q. Okay.**
7 A. And, you know -- and I'm not exactly clear.
8 And I'll have to look at it, obviously, but
9 you asked me earlier had I seen mold. And I
10 think -- and I might have misspoke or spoke
11 out of turn, but I -- I thought you meant was
12 there any -- had I seen any mold prior to
13 when I -- you know, this happened. I've
14 obviously seen mold at my house now because
15 it's still in my house. I mean I know what
16 mold looks like now.
17 And I'm not sure I answered that
18 question correctly; but if not, I'm trying to
19 clear the record. Up until this happened, I
20 had never seen any mold. Now I've seen mold,
21 and I have mold all in my house, you know.
22 But this shows the front of the house. And
23 in the front of the house, this area here

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL. 36104
ph: (334) 263-0261; fax 263-1243

Page 133

1    that I'm pointing at, the top half, all this
2    was missing shingles also. All this area
3    here has been tacked with new shingles.
4    **Q. Now, the guy who fixed them --**
5    A. Yes, sir.
6    **Q. -- he charged you $200?**
7    A. Yes, sir.
8    **Q. Was he running around giving just a flat**
9    **rate, hey, this is what I'll do it for?**
10   A. No. No, sir. This man, his wife is a
11   retired principal here; and we've known him
12   probably 20-something years. Matter of fact,
13   his granddaughter and my kids were raised in
14   the same household. Because you couldn't get
15   a roofer to come to your house, especially to
16   do this. And I asked Mr. Bone. I told him
17   what the problem was. He said, On my way
18   home tonight, I'll stop by and do that
19   personally. And he did.
20   **Q. All right. And I did -- I wanted to clear up**
21   **the mold, the mold issue that you just talked**
22   **about. You did see mold? I understand you**
23   **didn't see any before this Hurricane --**

Page 134

1    A. Right.
2    **Q. -- Ivan came through. You have seen mold in**
3    **your house since then?**
4    A. Right.
5    **Q. Tell me where.**
6    A. I've seen it in my child's bedroom.
7    **Q. Okay. Where and which one?**
8    A. My son's.
9    **Q. Okay. Where in your son's bedroom?**
10   A. Above the window where the roof connects.
11   **Q. Okay.**
12   A. That's one place. In the air handler room.
13   Of course, like I say, I didn't know what I
14   was looking at. I didn't know what it was.
15   **Q. Right.**
16   A. And in the air handler room, it was just
17   covered black. It was just different colors
18   actually, but mainly black circles. And then
19   we have since found it -- we have found it in
20   my daughter's room and in the attic. The air
21   handler room is covered with it.
22   **Q. The air handler room, what kind of surface**
23   **were these black circles on?**

Page 135

1    A. They were on the -- that particle board.
2    **Q. The floor?**
3    A. Yes. The floor and where it connects.
4    There's two by fours, you know, obviously the
5    frame. And then, of course, there's that --
6    like some type of particle board or
7    something. It wasn't on the particle board,
8    but it connected to the two-by-fours. It was
9    actually growing on the wood, but not on
10   the --
11   **Q. All right. And then in your son's room,**
12   **you've seen it above the window?**
13   A. On the crown moulding is the first place we
14   noticed it in his room.
15   **Q. Is it still there today?**
16   A. Well, since then, there's traces of it.
17   About every two days we got some solution and
18   we scrape -- we wipe our stuff and we keep
19   it -- or -- I don't let my wife go up in the
20   attic, but she helps me in the house. But I
21   go up in the attic and this stuff we dry --
22   keep it dry, especially after a rain. So it
23   does help to control it in the bedrooms.

Page 136

1    The -- the attic is out of control. There is
2    no keeping up with it.
3    **Q. Let me stop you for a minute. You told me**
4    **about your daughter's room.**
5    A. Yes.
6    **Q. Where is it in your daughter's room or where**
7    **has it been?**
8    A. It's been at the window and in her closet.
9    **Q. Okay. Has --**
10   A. Which --
11   **Q. Has it been on the top of the window or --**
12   A. About to where the -- where the --
13   **Q. Where it connects?**
14   A. Where it connects to the roof.
15   **Q. And in the closet, where has it been? On the**
16   **ceiling? On the walls?**
17   A. On the wall and the ceiling in her room.
18   **Q. And that's something that, using the**
19   **solution, you've been able to get rid of.**
20   **Will it come back?**
21   A. Yes, sir, it comes back. All I can do --
22   like I say, the attic is just too damp still
23   and just too out of control, just obviously

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 36104
ph: (334) 263-0261; fax 263-1243

Page 137

1    with that heat up there. In my daughter's
2    room and my son's room, I can keep it wiped
3    down. It's always discolored. And if you
4    stop -- like if we go away for three or four
5    days, it's back. And all you can do is try
6    to keep it dry.
7    Q. The attic -- you've seen mold in the attic on
8        all the surfaces?
9    A. Everywhere. It's just covered in the attic.
10    It's just -- like I say, there's no keeping
11    up with it. It's on all the two-by-fours.
12    It's on the air handler that goes in there,
13    especially above and below where these
14    things -- it's just -- it's everywhere.
15    Q. What does it look like?
16    A. Well, it's different. Most of it is like
17    black and like fungus looking. I call it
18    fungi and it will have like a white spot in
19    it. Some of it is solid white. It's just --
20    and what the guy told me, it's just different
21    kinds of -- of mold. You have so many
22    different kinds.
23    Q. All right. And the mold in the attic has

Page 138

1        been present for how long, you think?
2    A. Well, I would say, you know, a month after it
3    happened, obviously, I think it was there.
4    And it's still there, so --
5    Q. All right.
6    A. It was noticeable. And he told me -- the
7    first adjustor told me that, Mr. Sanders, he
8    said, where you're going to have your biggest
9    mold problem -- in his opinion -- and I never
10    even heard of mold, what mold is -- he said,
11    is inside of your walls, because you
12    can't see it and you can't treat it if you
13    can't see it. And that went along with the
14    industrial hygienist assured me that --
15    because he cut holes in my walls and told
16    us. He said, yeah, you got mold growing in
17    your walls also.
18    Q. Okay. 55?
19    A. Is the air handler room.
20    Q. Is that the particle board where the floor --
21    A. Yes. Yes, sir.
22    Q. And is it the top section? Is that -- looks
23        kind of discolored to me.

Page 139

1    A. Yeah. I think this is probably the -- this
2        is the bottom.
3    Q. Okay.
4    A. And it, you know, goes up. That's what I'm
5        thinking.
6    Q. Maybe Chris can figure out how it's turned.
7        MR. ELY: This one.
8        MS. SANDERS: This is the one -- this
9            is underneath the air -- the air
10            handler room actually --
11        THE WITNESS: Yeah. That's underneath,
12            that's right.
13        MS. SANDERS: And the vent -- where the
14            return vents come through like.
15            It's underneath.
16        MR. SANSPREE: She might be the better
17            person to --
18        MR. ELY: Sounds like it.
19        MS. SANDERS: Sorry.
20        THE WITNESS: There you have it.
21    A. And, obviously, this is -- I mean, I assume
22        this is the air handler room.
23        MS. SANDERS: Yeah. I think this is

Page 140

1        actually -- if you take a camera
2        and turn it upside down in the air
3        handler room.
4    Q. Would it help if I did them like this?
5    A. Well, yeah. I mean that's the -- yeah.
6    Q. I'll just do them like this.
7    A. That's obviously up under the air handler
8        room.
9    Q. Okay.
10    A. That's exactly right.
11    Q. When you say -- 57, when you say up under the
12        air handler room --
13    A. Uh-huh. Okay. You know where you -- you got
14        your air handler, you got your unit? You
15        open the two doors and there's your unit, you
16        know, and you got your water heater sitting
17        right beside your unit? Well, up under there
18        is the return, you know, where your water
19        flows out from your unit.
20    Q. Right.
21    A. And you need to put your filters down here,
22        your air filters. So if you open up the two
23        bottoms, that's what's below there.

Page 141

1   Q. I see. And what were 57 and 58 to show?
2   A. The same thing. Well, see in that picture,
3       you can't tell. It's soaking wet. That's
4       what it -- it shows is that it's just so wet.
5       And that was back, like I say, a month
6       after. And that to depict was just the water
7       standing in there.
8   Q. All right. And let's see. I think we're
9       on -- I got a little number on here. 59?
10  A. That's the air handler itself.
11  Q. 60?
12  A. And that's the air handler -- no, that's
13      the -- yeah, that's the top of the air
14      handler room right there where it comes in
15      from the attic.
16  Q. What were these taken to show?
17  A. Just the -- you know, the water. I mean, you
18      can't see it in there, but just water
19      everywhere.
20  Q. When you took these pictures, all this was
21      wet --
22  A. Uh-huh.
23  Q. -- to the touch? You could just go up --

Page 142

1   A. Uh-huh.
2   Q. And I'm saying all of this, I'm talking about
3       the area around the vent.
4   A. Right. Absolutely.
5   Q. That's a wall?
6   A. Yes, sir.
7   Q. All right. Since -- this is another question
8       I'm going to ask you before I forget it.
9       Since -- was it Mr. Bone?
10  A. Uh-huh
11  Q. -- came out and fixed your roof for you, have
12      there been any other -- and aside from the
13      work you told us you've been doing --
14  A. Uh-huh.
15  Q. -- has there been any other work done on the
16      house since then?
17  A. No.
18  Q. Okay. 61 through 67 look like a number of
19      attic pictures.
20  A. Yeah. They're all showing the attic. And
21      this is where there -- does that say three?
22      What's that say?
23  Q. No. 61.

Page 143

1   A. It looks like a three from right here. I
2       mean look at -- well, you ain't blind.
3       Anyway, this shows -- that's pretty bad,
4       ain't it? This shows the attic. And you see
5       this is the air handler right here. This is
6       the -- one of the buckets that catches
7       water.
8   Q. This blue thing --
9   A. This blue thing is --
10  Q. -- on top of the air handler is a bucket?
11  A. Yes, sir. Here is the air handler room,
12      60 --
13  Q. Two.
14  A. 62 is the bucket on top of there. And you
15      see all this insulation?
16  Q. Yes, sir.
17  A. All this is soaking wet. That's why it's
18      lumped together. It's just all wet. You
19      asked about the mold. There is mold now
20      growing on all these two-by-fours, and
21      there's mold everywhere, but. All this is as
22      it was the day that the enforcer there came
23      into my house and put his hands on my wife.

Page 144

1       And he didn't even walk in there. He stuck
2       his camera in there and took his pictures.
3           And there's again, this is the bottom of
4       the air handler room --
5   Q. 63?
6   A. -- showing the -- the water.
7   Q. This is right over the air -- obviously right
8       over the air handler room.
9   A. Yes, sir. And that's what it shows is all --
10      this -- and as you can see when you walked
11      into this attic prior to the hurricane -- and
12      this is blown in insulation -- you see all
13      these two-by-fours and stuff, you could see
14      none of this. All this -- the only thing you
15      could see when you walked up into my attic
16      was just insulation. It was all fluffed up,
17      and you could see none of this.
18          Well, actually, as the water hits it, it
19      just mats it down; and that's why you see all
20      these boards here. You never could see any
21      of that before.
22  Q. All right. 64?
23  A. And this shows towards I believe my

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.    7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

37 (Pages 145 to 148)

Page 145

1    daughter's room. And you see here, this is a
2    return, you know, that -- that you could see
3    now because the water -- this is my
4    daughter's -- above my daughter's room. Like
5    I say, all this was fluffed up way up here
6    and you could -- there's so much rain come in
7    here now you can actually see the handler
8    itself, you know --
9    Q. Right.
10   A. -- going into there.
11   Q. 65?
12   A. And this just shows again -- and, like I say,
13   you can't really see it; but it was wet. And
14   I was just taking the picture just to show
15   that.
16   Q. All right.
17   A. And this goes --
18   Q. 66?
19   A. -- goes across from my son's room, which is
20   in the front of the house. And you can
21   see -- you can start now seeing all the
22   two-by-fours and stuff because the water
23   continues to run in and just wad up the --

Page 146

1    mat up the insulation.
2    Q. 67?
3    A. And a picture of the same thing that --
4    Q. Bucket?
5    A. Right.
6    Q. All right. 68, 69 and 70?
7    A. This is one of the bedrooms. This one here,
8    I think this is my daughter's bedroom.
9    Q. Hang on. 69 is what you're talking about?
10   A. 69. As you can see, this is the original
11   like when it first started, you know, when we
12   first started having a problem. All this is
13   wet and obviously dried. It goes from one
14   side of the room to the other. It's just
15   water had dripped; and, like I say, this
16   whole spot is where you seen the water
17   dripping.
18       68, I think is my son's room. And it
19   shows -- you can see the wet spot across his
20   room, across his ceiling. And it goes all
21   the way across again. And this is a picture
22   of --
23   Q. 70.

Page 147

1    A. 70 is obviously a picture of the living
2    room. And, obviously, you can't see what I
3    meant to depict out of it, but --
4    Q. Okay. 71, 72, and 73 look like carpet
5    pictures to me.
6    A. That's correct.
7    Q. Where is that in the house, though, 71?
8    A. This right here is in the living room. This
9    is below that built-in book cabinet I told
10   you.
11   Q. Yes, sir.
12   A. And like I say, we meant to show how wet it
13   was in here. And, of course, you can't see
14   from this picture. You can see it on the --
15   on the disk, though. All this carpet is
16   delaminated, and that's what we meant to show
17   here. And, of course, it has the
18   delamination, you know, stain onto the pad.
19   Q. What do you understand delaminated to mean?
20   A. Delamination to me means that the -- the
21   backing on the back of the carpet and the
22   carpet itself have pulled apart.
23   Q. Okay.

Page 148

1    A. Is that what you mean it --
2    Q. Yes, sir. That's what I -- I want to know
3    what you understood it to be.
4    A. Okay. And that's what I understand it to
5    be. And I have it all over my house. But
6    you can take this -- and you see she's
7    holding it up with the corner. You can take
8    the back of my carpet and you can pull it and
9    the backing just pulls off, and that's called
10   delamination.
11   Q. Okay.
12   A. And that's what that is. This picture here
13   is the same thing. And, okay, this is --
14   we've pulled it up, and you can see -- right
15   here you can see all the --
16   Q. 72?
17   A. 72. You can see all the stains and how it's
18   all just falling apart. It's delaminated.
19   Q. Okay.
20   A. And this is the same thing showing the bare
21   floor.
22   Q. Yes, sir.
23   A. And you can see, obviously, it's been wet

Page 149

1    because it was water that thick down in here,
2    and you can see where it just all turned to
3    colors in it, and that's what it done.
4    **Q. All right. 74 and 75?**
5    A. This is the -- this is in the living room,
6    the ceiling here, the molding at the top.
7    This is where I told you it came down. In
8    all the rooms when it would leak from the
9    attic into the -- into each individual room,
10   the water -- except one place in the living
11   room, it came straight in the middle of the
12   room. But it would come behind the crown
13   moulding is where your moisture, your water,
14   would come from and come out here; and then
15   it would just -- like I say, as the water
16   obviously ran down inside here it would make
17   a bigger ridge. And that's what that's
18   showing, how that's where it came from.
19   **Q. Okay. 76?**
20   A. This is showing my kitchen table. This is my
21   kitchen table which sits, obviously, by the
22   window in the dining. And, of course, that's
23   what the water did to it. Standing water

Page 150

1    just buckled it. And the same way with the
2    chair. This is one of the chairs.
3    **Q. 77 is the chair?**
4    A. Yes, sir. And that's what it did.
5    **Q. All right.**
6    A. This is a picture of a living room window.
7    And, obviously, I was going to show the decay
8    on the window, but you can't -- I can't make
9    it out in that picture.
10   **Q. 78, 79?**
11   A. This picture you have seen a couple of times
12   of the living room, and this is where the
13   bottom of it just rotted from the water.
14   **Q. 80?**
15   A. This is one of the windows in the -- the
16   middle window in the living room right next
17   to that one. And you can see where it has
18   just cracked it all along the seam from where
19   the water came in.
20   **Q. Okay. 81?**
21   A. Same thing. This the far right window, same
22   thing. It was just on every window, it
23   has --

Page 151

1    **Q. Cracks in the window?**
2    A. Yes, sir.
3    **Q. And 82?**
4    A. Just shows -- this is the window in the -- I
5    believe the kitchen where the -- by the table
6    where the water came in there and same thing
7    with that one. That's the other one.
8    **Q. Now, if you can figure out what 83 is --**
9    A. Okay. There again, I think we're going to
10   have to let that one go. I don't know what
11   that one is.
12   **Q. 84?**
13   A. This is the same picture you sent.
14   **Q. If you can figure out what 85 is, you're**
15   **doing a pretty good description.**
16   A. Yeah. I don't know what was meant to be
17   shown there, but it obviously didn't come
18   out. Okay?
19   **Q. And 86 looks to me to be more carpet.**
20   A. This is more carpet over here by the window,
21   by these three windows that you saw. And, of
22   course, all this was under water, too; and
23   that's -- that's what we're showing.

Page 152

1    **Q. Okay. 87?**
2    A. This is the foyer floor.
3    **Q. Okay. And I think I've seen that before.**
4    A. You've seen a picture of that.
5    **Q. This is 88?**
6    A. And this is --
7    **Q. Same thing, isn't it?**
8    A. Yeah. I'm trying to catch -- trying to show
9    you the bow in the floor is why I took it at
10   an angle; but whether you can see it or not,
11   I don't know.
12   **Q. Okay. And then 89 looks to be the bookshelf**
13   **straight on.**
14   A. Bookshelf right on, not lining up. You see
15   the bottom where it's -- where it's off
16   center there? It doesn't line up anymore.
17   **Q. And the bookshelf is where?**
18   A. That's it. The one you've been looking at --
19   **Q. That's in the --**
20   A. Living room.
21   **Q. Living room. What is this on the floor?**
22   A. That's where we had the carpet pulled up.
23   And that's just showing the padding or

Page 153

1      whatever right there.
2   Q. Is carpet in your house tacked back down?
3   A. Yeah.
4   Q. It's been fully reinstalled?
5   A. Right.
6   Q. 90?
7   A. That's -- that's the same bookshelf up
8      there. And just, like I say, this is where
9      the water starting coming in up here.
10  Q. Okay. This is where it -- it's at the top?
11  A. That's correct.
12  Q. 91?
13  A. This is the -- this is the -- where the
14     bookshelf is, same thing, just the right-hand
15     side of it where it's just separated all the
16     way across.
17  Q. All right. And I'm just going to let you
18     thumb real quick through the rest of these
19     and see if there is anything that you can
20     identify. If you can't, that's fine.
21  A. Okay.
22  Q. Because some of them you may not remember
23     what they are.

Page 154

1   A. This is in the living room.
2   Q. Which one?
3      MR. ISENBERG: 94?
4   A. 94 is in the living room, just showing a --
5      where a spot came in. 95 -- is that 95?
6   Q. Yes, it is.
7      MR. ISENBERG: Yes.
8   A. This shows the -- remember, I told you where
9      normally it came in through the crown
10     moulding in every room?
11  Q. Yes, sir.
12  A. This -- this is the fan in the living room,
13     and the water came through here. And of
14     course you may not can see it that well here,
15     but it all buckled as it is now. It all
16     buckled, and the water came through --
17     straight through the middle into this fan.
18  Q. Came through the fan?
19  A. Uh-huh.
20  Q. Okay.
21  A. And I think that's -- and this here --
22  Q. 97?
23  A. 97 is -- this is right here -- this right

Page 155

1      here is where the bookcase is. And this is
2      the fireplace.
3   Q. Okay.
4   A. The fireplace is right here. The water came
5      in through the ceiling, comes all the way
6      down. That's how it separated the whole --
7      that's just the fireplace is what that is.
8   Q. All right.
9   A. That appears to be that same picture of
10     the --
11  Q. Carpet?
12  A. Uh-huh.
13  Q. 98?
14  A. Obviously, that was --
15  Q. 99?
16  A. I don't know what that is. And that's --
17     that appears to be --
18  Q. 102.
19  A. This is in the air handler room again. This
20     is the air handler room.
21  Q. Okay. 102 and 103 and then 104 looks like
22     the air handler room again.
23  A. Yes.

Page 156

1   Q. 105?
2   A. Air handler room.
3   Q. And that's just again to show how wet it is?
4   A. Right. And do you remember which one of
5      those -- what is this?
6   Q. 107.
7   A. This is the air handler room. This is where
8      I told you, you may could change the --
9   Q. The return unit, yeah.
10  A. Uh-huh. And this is in the hallway right
11     below this right here.
12  Q. The water?
13  A. Well, all that water. Because all that water
14     was coming down inside there. And it just,
15     you know, come out into the hallway.
16  Q. 108, what I'm looking at on the top, this is
17     a baseboard. This is a wall?
18  A. Uh-huh. That's what I'm talking --
19  Q. And discoloration of the carpet is showing
20     that water came underneath the baseboards --
21  A. Right.
22  Q. -- and out from the return unit. Was this
23     room where the most water was, was in your --

Page 157

1    what have we been calling it?
2        MR. ISENBERG: Air handler.
3    Q. -- air handler room?
4    A. I can't say that because it was just -- I
5      mean it was such a tremendous amount of water
6      everywhere. I can't say what had more than
7      the other.
8    Q. All right. That's fine. 110?
9    A. 110, this is the kid's bathroom.
10   Q. Okay.
11   A. And you can see where the water came through
12     the ceiling on the kid's bathroom.
13   Q. They've got a bathroom that's joined between
14     the two rooms?
15   A. Right across there. Yeah. Right next to the
16     air handler room, actually, right across the
17     hall from there.
18   Q. Okay. And then 111?
19   A. That appears to be one of the kid's rooms. I
20     can't say.
21   Q. And 112, if you can --
22   A. I -- I can't say.
23   Q. All right. Mr. Sanders, how long have you --

Page 158

1    do you recall how long you had home insurance
2      with Standard Fire?
3    A. Since November of 2001.
4    Q. And you originally got that through the
5      Pinckard Agency?
6    A. Yes, sir.
7    Q. How did you come across the Pinckard Agency?
8    A. I don't remember, to tell you the truth. I
9      don't know if -- I don't know that we didn't
10     just choose them. I -- I don't know.
11   Q. So this house, as long as you've had it, was
12     insured by Standard Fire?
13   A. Yes, sir.
14   Q. Who insures it now?
15   A. Standard Fire.
16   Q. Still Standard Fire?
17   A. Well, nobody actually, but -- obviously, no
18     one.
19   Q. Did you --
20   A. To answer your question.
21   Q. Did you at any point receive a policy for any
22     of the policy years before this one?
23   A. No, sir.

Page 159

1    Q. Never had a policy?
2    A. No, sir.
3    Q. And who is the person you dealt with at
4      Pinckard when you filed a claim?
5    A. Selia Courson and Marti Washing. And can I
6      say something about them two?
7    Q. Sure.
8    A. I want to say them two women, they lied to
9      me. They told me that I was getting a
10     replacement policy, that it would have no
11     depreciation amount on it. It wouldn't be
12     repaired; it would be replaced. There would
13     be no depreciation. I filed a claim. They
14     didn't give me replacement value. They
15     didn't fix everything, number one, not near
16     what was wrong with the house. What they did
17     give me had -- had depreciation on it.
18     Because I seen the check that they sent. It
19     had depreciation amounts on what they gave
20     me. So that was a lie. And I would have
21     never bought that contract if I knowed that
22     that was a -- you know, that was the deal,
23     that they were lying to me. So they lied to

Page 160

1    me.
2    Q. Did anyone at Standard Fire -- Ms. Harper,
3      Mr. Fryer, or Mr. Coffin -- tell you that
4      they thought you were filing a fraudulent
5      claim?
6    A. No.
7    Q. The only people who told you they thought you
8      were filing a fraudulent claim was ICA folks?
9    A. And -- and Pinckard.
10   Q. And Pinckard? Okay. I tell you what,
11     Mr. Sanders, we've covered a bunch of stuff.
12     I want to check over my notes and make sure
13     that I've covered everything I need to cover
14     with you. There may be a couple more things,
15     but I'm so -- we've covered so much I want to
16     go back and look.
17   A. Okay.
18   Q. Probably be a good time for a break.
19       (Brief recess)
20   Q. Just a few more things.
21   A. Okay.
22   Q. What did you do with the check that you got
23     from Pinckard?

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.                    7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

Page 161

1   A. I believe my attorney has it.
2   Q. It's never been cashed?
3   A. No.
4   Q. I know we've talked in generalities about
5       when you first saw the mold in your house.
6   A. Uh-huh.
7   Q. When you took those photographs -- when we
8       went through them, I didn't see any of them
9       where there is mold depicted in any of the
10      photographs. And I don't think you told me
11      this was to show mold, so on and so forth?
12  A. Right.
13  Q. And I understand those were taken sometime in
14      late October or early November?
15  A. Right.
16  Q. And I'm putting two and two together that you
17      didn't notice any mold until at least after
18      those photographs were taken.
19  A. Right.
20  Q. Do you remember, was it -- any idea, any
21      estimate as to when it was after those
22      photographs? Was it after Christmas? Was it
23      January this year?

Page 162

1   A. What?
2   Q. When you first noticed mold in the spots
3       you've described to me already.
4   A. No. We started noticing mold in November --
5       I would say November. Wasn't real clear on
6       what it was, but knew there was something
7       growing in our house.
8   Q. So it was a period of weeks --
9   A. It had been several weeks.
10  Q. -- after those photographs?
11  A. Yes, sir.
12  Q. Did you contact anybody to come help you
13      remediate the mold, or what did you do once
14      you figured it out?
15  A. I just contacted my attorney and let him
16      handle it.
17  Q. Who actually contacted the Pinckard Agency to
18      start this policy in November of 2001? Was
19      it you or your wife?
20  A. Both.
21  Q. Do you remember if you had any conversations
22      with Standard Fire at that time, or was it
23      just Pinckard Agency folks?

Page 163

1   A. You know, I don't recall.
2   Q. And I'm not going to try and ask you to get
3       in ahead of your lawyer, but he's filed a
4       bunch of things in this case. And he filed a
5       second amended complaint in the case.
6   A. Uh-huh.
7   Q. In paragraph 64, it talks about a hail loss
8       in May of 2003. Do you recall?
9   A. I believe it's actually April, but 2003. It
10      should have been April.
11  Q. Okay. Tell me about that.
12  A. We had a hail storm. I think it was April
13      25th, 2003. And a pretty severe hail storm
14      as I recall. We had a lot of the -- the
15      stuff on the shingle come down on the ground,
16      as we talked about a while ago. The -- I
17      don't know the name of it, but -- you know,
18      the grainy substance of the shingles come
19      down. And I would say approximately 20 folks
20      in our neighborhood all got roofs because of
21      the hail damage. So my wife went down to
22      Pinckard and told them that we thought we may
23      have hail damage. And, actually, we had a

Page 164

1   roofer come over who said we did need a new
2   roof. But she went to Pinckard and filed a
3   claim, and they sent a guy out. And he
4   looked at our roof and he said, I'm taking
5   pictures. He said, you do have hail damage,
6   but it's not severe enough to put a new roof
7   on. He said, I will note it and put it in
8   your file. So that was the end of that.
9   Q. Do you remember who that person was?
10  A. I don't remember his name.
11  Q. Did you meet with him personally?
12  A. No. My wife did.
13  Q. And you didn't notice any leaking or anything
14      after that?
15  A. No.
16  Q. Was there any physical damage that you
17      observed?
18  A. I -- I mean yes, there was physical damage
19      all over the roof and the fence. There were
20      little marks like little ping marks, you
21      know. And, of course, my wife could probably
22      answer this better because she actually --
23      the guy pointed out to her the pings on the

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.
DEPOSITION OF WILLIAM P. SANDERS

7-19-2005

42 (Pages 165 to 168)

Page 165

1       air conditioning unit and the pings on the
2       fence. And, of course, we had car damage;
3       but he just said it wasn't severe enough to
4       get a roof.
5   Q.  Have you ever filed a lawsuit other than this
6       one?
7   A.  Unh-unh.
8   Q.  Have you ever been sued individually?
9   A.  No.
10  Q.  And I'm pretty safe in asking this question.
11      I think I know the answer. Have you ever
12      been convicted of a crime?
13  A.  No. I -- no, I ain't done that one, now.
14      I've done a lot, but I ain't --
15  Q.  We've got to ask every time. I just figured
16      I would make sure. And I'm not sure I
17      understand. Are you contending -- I mean
18      aside from what your lawyer has pled, you
19      personally, what are you seeking by putting
20      this May 2003 hail loss into this lawsuit?
21  A.  I'll just let a jury determine that. I mean,
22      I'm just letting all the facts be known.
23  Q.  Are you contending -- I mean, I guess what

Page 166

1       I'm asking you is, is there anything that
2       you're contending Standard Fire did wrong in
3       adjusting that claim to -- that's what I want
4       to know, period.
5   A.  Well, the reason I bring that up is because
6       when the roofers and the -- our experts came
7       and looked at my roof. They said, you have
8       damage; you have hail damage on this roof;
9       they should have replaced your roof.
10  Q.  So the thing that you're complaining about in
11      the May 2003 hail damage loss is that you
12      should have had a new roof as a result of
13      that. Aside from that, is there anything
14      else that Standard Fire did or didn't do that
15      you have knowledge of that you're complaining
16      about in this lawsuit?
17  A.  That's a big question. That's a lot of
18      question. Bear with me there a minute.
19  Q.  Maybe I can make it simpler.
20  A.  Okay.
21  Q.  Have you got anything else that you're upset
22      about or you think was done wrong about this
23      May 2003 loss other than replacing your roof?

Page 167

1   A.  No.
2   Q.  Okay. That's what I wanted to know.
3   A.  I mean, I ain't making nothing up. You see
4       what I'm saying? I ain't -- I'm just want --
5   Q.  No. What I'm trying to ask you is if there
6       is any -- you know we talked a lot today
7       about how you were treated.
8   A.  Right.
9   Q.  And I understand that this is a breach of
10      contract; that part of this lawsuit, you are
11      saying that the roof should have been
12      replaced at that point under that policy of
13      insurance. And I understand that. But I
14      want to make sure there is no other conduct
15      by the Travelers adjustor or anybody else
16      that you're complaining of.
17  A.  At this time?
18  Q.  Aside from -- yes. In May 2003.
19  A.  No.
20  Q.  And we've talked about a bunch of
21      conversations.
22  A.  Yes, sir.
23  Q.  With Mr. Harper, Mr. Fryer, Mr. Coffin.

Page 168

1   A.  It's Ms. Harper.
2   Q.  Ms. Harper. Ms. Harper. Is there anything
3       that you can think of after all we've been
4       over that you would like to add about what
5       you think they did or didn't do?
6   A.  Well, I think they lied to me from top to
7       bottom. They had no interest in helping me
8       whatsoever. I think I let Travelers -- I let
9       Standard Fire know under no certain terms
10      that -- that I had a problem. These folks
11      were not treating me right. I let them know
12      the allegation about Pinckard and ICA saying
13      that I was trying to file a fraudulent
14      claim. I let them know all that was going
15      on. And I begged them. I begged them. And
16      you'll -- you've seen it because I've read
17      it.
18          Well, the woman -- I called the woman at
19      Travelers, which is in the file number; and I
20      begged her to please get somebody to call me
21      if she could. And they wouldn't. So I made
22      them well aware of what was going on, and
23      they chose not to help me. They chose to

WILLIAM P. SANDERS, ET AL. v. STANDARD FIRE INS. CO., ET AL.                                        7-19-2005
DEPOSITION OF WILLIAM P. SANDERS

43 (Pages 169 to 172)

Page 169

1   ignore me. All this stuff led to my -- my
2   kids being injured, us living in that stuff.
3        Like I say, I was lied to. You know, I
4   paid for a contract. I paid for a contract.
5   I wasn't given that contract. I wouldn't
6   have bought that contract. Standard -- I
7   made Standard Fire aware of what was going
8   on, and they chose not to step in.
9        MR. ELY: Okay. Mr. Sanders, that's
10       all I got for you today.
11   THE WITNESS: That was a lot. I
12       appreciate it. And when you get
13       off the record -- well, I'll tell
14       you on the record. I appreciate
15       both of y'all, how you treated
16       me. I didn't know kind of what to
17       expect from you. Like I say, I
18       have no anger towards either one
19       of y'all.
20   MR. ELY: We understand.
21   MR. ISENBERG: We understand that.
22   THE WITNESS: I mean, you know, I kind
23       of -- you are actually even kind

Page 170

1       of the first people I've seen, and
2       I had to kind of vent on you. And
3       I've tried not to be ugly. And I
4       hope -- if I did, I apologize.
5   MR. ELY: You did fine.
6   THE WITNESS: Like I say, I know you're
7       doing a job just like I do. And I
8       appreciate you listening to me and
9       putting up with me. Okay?
10   MR. ISENBERG: We didn't have to put up
11       with you.
12   THE WITNESS: Well, I appreciate your
13       time and the way you treated me.
14   MR. ISENBERG: All right.
15   MR. ELY: Well, that goes without
16       saying. You don't need to thank
17       us for that.
18   THE WITNESS: Well, thank you.
19       (The deposition concluded at
20       1:53 p.m.)
21       * * * * * * * * * *
22   FURTHER DEPONENT SAITH NOT
23       * * * * * * * * * *

Page 171

1        REPORTER'S CERTIFICATE
2   STATE OF ALABAMA
3   CHILTON COUNTY
4        I, Wendy Lewis, Court Reporter and
5   Commissioner for the State of Alabama at Large,
6   hereby certify that on Tuesday, July 19, 2005, I
7   reported the deposition of WILLIAM PHILLIP
8   SANDERS, who was first duly sworn or affirmed to
9   speak the truth in the matter of the foregoing
10   cause, and that pages 4 through 170 contain a
11   true and accurate transcription of the
12   examination of said witness by counsel for the
13   parties set out herein.
14        I further certify that I am neither of kin
15   nor of counsel to any of the parties to said
16   cause, nor in any manner interested in the
17   results thereof.
18        This 22nd day of July, 2005.
19
20
         _____
21       WENDY LEWIS, Court Reporter
         Commissioner for the State
         of Alabama at Large
22
         MY COMMISSION EXPIRES: 2/4/08
23

Page 172

1        SIGNATURE OF WITNESS
2        I, WILLIAM PHILLIP SANDERS, hereby
3   certify that I have read the transcript of my
4   deposition consisting of pages 4 through 170, and
5   except for the corrections listed below, certify
6   that it is a true and correct transcription.
7
8    _____
     WILLIAM PHILLIP SANDERS
9
     SWORN TO AND SUBSCRIBED before me
10   this _____ day of _____, 2005.
11
12   _____
     NOTARY PUBLIC
13
14        * * * * * * * * * *
15   Page  Line  Correction and reason therefor
16
17
18
19
20
21
22
23